[Crim. No. 20705. Aug. 5, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
DOUGLAS RAY STANKEWITZ, Defendant and Appellant.

[Crim. No. 21310. Aug. 5, 1982.]

In re DOUGLAS RAY STANKEWITZ on Habeas Corpus.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Supreme Court, and Steven W. Parnes, Deputy State Public Defender, for Defendant and Appellant and Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Paul V. Bishop, Edmund D. McMurray, Garrett Beaumont and Robert D. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BIRD, C. J.**—This case is before the court on automatic appeal. (Pen. Code, § 1239, subd. (b).)[1] Appellant was convicted of the murder, kidnap and robbery of Theresa Greybeal. (§§ 187, 207, 211.) The jury also found to be true two special circumstances, that the murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of (1) robbery and (2) kidnaping. (Former § 190.2, subds. (c)(3)(i) and (ii).)[2] A judgment of death was imposed.

---

[1]All statutory references are to the Penal Code, unless otherwise indicated.

[2]References are to the 1977 death penalty legislation, in effect on the date of the murder and since repealed by initiative.

## I.

Late in the evening of February 7, 1978, the 19-year-old appellant left Sacramento with his mother and brother, an older man named J. C., and three young companions, Teena Topping, Marlin Lewis and 14-year-old Billy B. Appellant was driving and the group's destination was Fresno.

They reached Manteca about 1 a.m. on February 8, and stopped at a 7-Eleven store for oil. Manteca police saw the car "irregularly parked" and ran a check on the license plate. Incorrect information was received that the vehicle had been stolen.[3] Several officers approached the car with drawn guns and frisked several of the occupants. The police officers told the group that they suspected that the car was stolen, and requested that they follow the officers to the Manteca police station. After several hours at the station, during which the police were unable to confirm the status of the vehicle, the group was told it was free to leave, but that the car was being impounded. Appellant asked directions to the local bus depot.

The group then went to an all-night doughnut shop near the bus station which was not yet open. After two hours had passed, appellant and J. C. left for about fifteen minutes. When they returned, Billy B. saw appellant give Teena Topping a pistol, and heard him tell her to place it in a bag.

About 8 or 9 a.m., the group went to the bus station. After several hours of waiting, appellant, Billy, Lewis and Topping decided to try to hitchhike. Appellant's mother and brother and J. C. remained at the bus station. Appellant and his three friends succeeded in hitchhiking as far as Modesto, but were unable to obtain a ride any farther. When the weather turned rainy and cold, the four walked to a nearby K-Mart store, where they stayed for several hours. Appellant indicated he would hot wire a car so the group could steal it and drive it to Fresno, but a search of the K-Mart parking lot for an unlocked car was apparently unsuccessful. Billy's sister in Fresno was called, but she would not come and pick up the group unless they made it as far as Merced.

A plan was formed to follow a K-Mart shopper to her car and then steal it. About 5 p.m., Theresa Greybeal left the store, followed by ap-

---

[3]The jury was informed by stipulation of counsel that the vehicle had not in fact been stolen.

pellant, Lewis and Topping. When Ms. Greybeal entered her car, Teena Topping pushed her over and got into the driver's seat. Lewis jumped in the back seat and opened the passenger door for appellant. Appellant pulled a pistol on Ms. Greybeal, and Lewis brandished a knife as Billy also got in the car. Topping drove the car to the freeway, where she turned south towards Fresno.

Once on the freeway, appellant told Ms. Greybeal not to worry because they were going to let her out in Fresno. Ms. Greybeal, who had been crying, calmed down somewhat and remarked that this would not have happened if she had her dog with her. Appellant displayed the holstered pistol and said, "This would have took care of your dog." Appellant then passed the pistol back to Lewis, who thereafter held it against Ms. Greybeal's back. Topping asked for money, and Ms. Greybeal handed $32 to Lewis. She also gave Topping her wristwatch, with the comment that insurance would cover the loss.

After a drive of between one and one-half to two hours, the group arrived in Fresno and drove to a bar known as the "Joy and Joy." Teena Topping went into the bar and returned a few minutes later with a woman named Christine Menchaca. Menchaca got into the car and suggested going to the Olympic Hotel, which was around the corner from the Joy and Joy. Topping and Menchaca went in first, then returned after several minutes to get appellant. Several minutes after the three had reentered the hotel, appellant returned and retrieved the pistol from Lewis. A few minutes later, appellant, Topping and Menchaca returned to the car. Appellant then appeared to be moving more slowly, in a generally tired condition, with glassy, droopy eyes.

After their return to the car, appellant and Teena Topping indicated they wanted to go to Calwa to "pick up," a term indicating they would obtain heroin. The car was driven to a street corner in Calwa. There, Topping told the others to get out and wait because she did not want anyone present when they went to "pick up." Appellant, Ms. Greybeal, Billy and Lewis got out of the car. Then Topping told Billy to get back in. From inside the car, Billy saw appellant walk toward Ms. Greybeal, who was standing to the rear of the car, looking away. Appellant raised the pistol with his left hand, steadied it with his right hand and shot her in the head from a distance of one foot. Ms. Greybeal fell to the ground, fatally wounded.

Appellant returned to the car and said to Lewis: "Did I drop her or did I drop her." Lewis replied, "You dropped her," and both laughed. As the car was driven from the scene, appellant cautioned Topping to slow down so they would not get caught. Appellant also inquired where the victim's purse was. Someone responded that it was not in the car. Lewis then said: "We made a big mistake."

After returning to Fresno, Christine Menchaca suggested going to the Seven Seas bar where she would try to sell the victim's watch. Appellant told her to try to get $60 for it. While Menchaca and Lewis were in the bar, police officers approached and asked the occupants for their names and identification. After some brief questioning, the officers left.

When Menchaca and Lewis returned from the bar, appellant suggested going to a house in Clovis where he was supposed to meet his mother. At the house, appellant tried unsuccessfully to sell the victim's watch. A girl came out and told 14-year-old Billy that his mother had put out a missing person's report on him. Billy asked to be driven home to Pinedale.

When he arrived home, Billy began to cry and told his mother what had happened. She called the police who came and took a statement from Billy. At 11 that evening, police saw Ms. Greybeal's car near the Olympic Hotel and arrested appellant, Topping, and Lewis, who were in possession of the car. The pistol that had been used to kill Ms. Greybeal was found in the car, and her watch was found in the jacket of Christine Menchaca, who was arrested nearby.

The foregoing account of the murder came primarily from Billy B. Brown, an accomplice. Other witnesses were presented to corroborate various portions of the testimony. Appellant and his companions were observed in Manteca at the doughnut shop. Billy's sister testified regarding the receipt of phone calls from Manteca and Modesto. Other witnesses saw persons resembling Billy and appellant at the K-Mart in Modesto on February 8th. Fresno police officers testified about encountering appellant, Billy, and Topping in Ms. Greybeal's car at the Seven Seas bar about 8 p.m. An officer testified about how appellant and the others were ordered out of Ms. Greybeal's car and arrested later that night. The officers who discovered Ms. Greybeal's body were called, as well as the coroner who performed the autopsy. A criminalist

testified that the results of tests performed on the physical evidence were consistent with Billy's account as to how the shooting occurred.

Also introduced at the guilt phase were 10 handwritten sheets of yellow paper seized from appellant's cell on July 7, 1978. The handwriting was identified as appellant's. These papers contained narrative scripts for Topping, Menchaca and Lewis, indicating how the kidnaping and homicide assertedly occurred. The killing was blamed on Lewis.

Appellant's counsel presented a diminished capacity defense based upon mental defect and, to a lesser extent, drug intoxication. The theory of the defense was that appellant suffered from a mental defect which, although not rendering him *incapable* of premeditating and deliberating, greatly reduced the likelihood that he had *actually* done so. If accepted by the jury, this view of the evidence would have constituted a defense to the two special circumstances, since both required a finding of premeditation and deliberation. The diminished capacity defense admitted liability for robbery, kidnaping, and second degree murder, but would have avoided a conviction of first degree premeditated and deliberate murder.[4]

Dr. Leifer, a clinical psychologist, testified regarding the results of his psychological examination of appellant and his review of prior psychiatric and institutional examinations of appellant from the time he was eight years old. The intelligence tests given to appellant indicated an overall dull-normal level of intellectual functioning, below normal but "somewhat above what is commonly referred to as mentally retarded." However, performance on various portions of the test varied widely, from extremely retarded to average. These fluctuations reflected a "tremendous unreliability" in appellant's *intellectual functioning in any given situation.* Dr. Leifer concluded that appellant's thinking was "wish dominated" and that appellant was unable to consider "the full implications of his actions." Dr. Leifer conceded on cross-examination that there was no evidence of a major thought disorder or symptoms of psychosis. He also stated that appellant had the capacity to understand the moral and societal sanctions against killing.

---

[4]The prosecution also sought a first degree murder conviction on the alternative theory of robbery-murder. (See § 189.) Appellant's trial counsel argued against this theory by contending that the robbery had terminated prior to the killing, so that the killing was not "committed in the perpetration of ... robbery ...." (*Ibid.*)

The defense called Dr. Melges, a psychiatrist. Dr. Melges had treated the appellant in 1973 and 1974 at a California Youth Authority facility. Dr. Melges stated that appellant had at that time little ability to weigh the consequences of his actions. Appellant was described as being extremely "present-oriented," not thinking beyond the next 30 seconds. Dr. Melges attributed this to appellant's history of being victimized by child abuse and being switched from his parents' home to a hospital to a foster home and back to his parents, many of these changes occurring abruptly. Cross-examination elicited that Dr. Melges had written in 1974 that appellant had made gains while under treatment in rejecting his family's extreme proneness to violence. Dr. Melges stated that he had diagnosed appellant as a sociopathic type.

The main testimony to support the defense of lack of deliberation was given by Dr. Missett, a psychiatrist. Dr. Missett concluded that appellant's ability to deliberate meaningfully and maturely about the nature of his acts was only 5 percent of that of a normal 19-year-old. Dr. Missett also concluded that it was highly unlikely that appellant did in fact deliberate meaningfully prior to killing Ms. Greybeal.

According to Dr. Missett, appellant suffered from a mental defect in that he functioned on the emotional and mental level of an impulse-ridden 14- or 15-year-old. Dr. Missett's opinion was based on an interview with appellant, the psychological tests of Dr. Lieffer, and psychiatric and other reports of appellant's personal history. Dr. Missett conceded appellant's mental capacity to premeditate the murder and form the intent to kill. Although conceding appellant's abstract mental ability to reflect meaningfully and maturely prior to an act, Dr. Missett stated that it was highly unlikely that appellant in fact so deliberated prior to the killing.

The prosecution obtained an order for an examination of appellant by another psychiatrist, Dr. Zeifert. Dr. Zeifert testified that appellant had refused to cooperate in the examination. Nevertheless, on the basis of what appellant did say and on the other available records, Dr. Zeifert concluded that appellant did not suffer from any mental defect or any lack of capacity to deliberate and premeditate a homicide.

After the jury convicted appellant of all the charges and found all allegations to be true, the penalty phase commenced. The prosecution introduced as aggravating circumstances evidence of several incidents

involving the use or threat of force by appellant. (Former § 190.3.) In mitigation, appellant presented evidence about the beatings he received as a child from his parents and about his removal from his parents and his placements at foster homes and Napa State Hospital.

Both before and during trial, appellant's relations with his appointed counsel, a deputy public defender, became a matter of dispute. Appellant's trial was initially set for July 5, 1978. On July 3, 1978, appellant's public defender informed the court that he had come to doubt appellant's mental competency to stand trial. The public defender testified that over the prior weekend a fundamental dispute had come to a head between himself and appellant as to how the trial should proceed. It was counsel's opinion that no amount of further discussion could resolve that dispute. Counsel indicated that he believed his client's position was irrational and, based on discussions with the psychiatrists who had previously examined appellant, was the product of a mental condition.

The trial judge appointed Dr. Glenn to examine appellant and to testify concerning appellant's competency to stand trial. This testimony was to be used to resolve the preliminary issue of whether there was reason to doubt appellant's competency, so that a full-scale competency examination and hearing pursuant to section 1368 should be conducted. After examining appellant, Dr. Glenn testified that appellant had a mental defect which prevented him from rationally assisting his deputy public defender in the defense of the case.

In the psychiatrist's opinion, appellant had alternating feelings of persecution and grandiosity. Among these were paranoid delusions that his public defender was in collusion with the prosecutor, that people were talking about him behind his back, and that he could join the mafia in jail and have the jury killed if they convicted him. Dr. Glenn indicated that appellant's delusional system "interfered with his ability to cooperate in the conduct of his defense." Appellant appeared capable of cooperating with another attorney who was not a public defender, because he indicated to Dr. Glenn that he would accept a private attorney's evaluation that the prosecution had sufficient evidence to convict him of the killing. During the psychiatrist's testimony, it became clear that the dispute between appellant and his public defender was over whether the defense should contest the issue of whether appellant was the perpetrator of the charged offenses or whether a psychiatric defense based on appellant's mental condition should be presented.

After Dr. Glenn's testimony, the court agreed that "for certain, it's been shown that [appellant] could not cooperate in a rational manner with the Public Defender." The court ruled that it had no doubt that "with other counsel he would be able to cooperate in a rational manner in preparation and presentation of his defense." Nevertheless, the court declined to institute competency hearings. Instead, it indicated that it felt that a question was raised as to whether there should be a substitution of counsel, but deferred ruling to give appellant and his counsel time for discussion.

After this discussion, appellant waived the attorney-client privilege so that counsel could tell the court the content of the discussion. Counsel informed the court that appellant wished to defend against the charges based on lack of evidence to establish his identity as the perpetrator of the offenses, while counsel wished to present a diminished capacity defense.

Under questioning by the prosecutor, counsel indicated that appellant understood that the diminished capacity defense urged by counsel would involve a concession and confession of an act that imposed some criminal responsibility.

Appellant had also repudiated his statement to Dr. Glenn that he would follow the advice of a private attorney, by saying that only if a private attorney would agree to defend on identity would he follow that attorney's advice. The public defender indicated that appellant was convinced that there was insufficient evidence to prove that he committed the offenses. Appellant had rejected his counsel's advice to proceed with a diminished capacity defense, saying, "Gotta fight it."

Appellant spoke up at this hearing to say that the only way he would take another attorney was if that attorney would do it his way, by fighting the charges. He then asked for a substitution of attorneys. The public defender did not join in the motion, but reiterated that he and his client had reached an impasse on whether the defense should be diminished capacity or identity, and he felt a full competency hearing should be conducted.

The trial court again refused to order a hearing on the issue of appellant's competency to stand trial and denied appellant's motion for substitution of counsel.

After the trial had been stayed briefly by appellate courts, and after a first attempt at jury selection ended in a mistrial, selection of the jury that decided the case began on August 14. As jury selection proceeded the following day, the public defender requested a recess, noting for the record that appellant was leaning back in his chair with his eyes closed. After the recess, appellant stated that he wanted to represent himself. The trial court told appellant that such a motion would not then be considered. The court also indicated that it thought appellant was totally unable and incompetent to represent himself. The court indicated that it would permit appellant to speak to the issue again the next morning, after some time for thought and consultation with his counsel. Appellant stated he would file a motion for self-representation.

The next morning, the trial judge inquired of appellant if he wished to make a motion for self-representation. Appellant replied that he had nothing to say, that the court had "already denied everything."

On August 31, the fourth of five days of prosecution evidence, appellant again asked for another attorney, stating, "It's a big conflict." The motion was referred to another judge. Appellant presented a handwritten statement to the court which stated that the public defender "has persistently denied me the right to subpoena and produce witnesses helpful to my defense and continues to proceed on a course of action contrary to my interests despite my repeated objections." When the court requested specific information on what witnesses appellant wanted to call and what testimony they wanted to provide, counsel invoked the attorney-client privilege. The court then held an *in camera* hearing, from which the prosecutor was excluded.[5] The motion for substitution was denied.

On September 12th, Dr. Missett testified on direct examination that appellant had admitted to him the killing and various details about the crime which were consistent with Billy B.'s testimony.[6] After the jury had been excused, appellant told the court that he wanted the doctor's testimony stricken. This request was repeated the next morning before the jury was brought in. Appellant said that Dr. Missett "lied up

---

[5] A copy of the sealed transcript has been provided to this court.

[6] At the request of both prosecution and defense, the jury was instructed that a medical expert's testimony about statements made during a diagnostic examination could be considered only as a basis for the expert's opinion and not as evidence of the truth of the facts disclosed. (CALJIC No. 2.10 (3d ed. 1970).)

there. I told that doctor I did no crime." Appellant again moved to discharge his counsel. The court said that it would not substitute counsel and questioned whether appellant could himself adequately argue the diminished capacity defense that had been presented. Appellant stated that he would not argue that defense, but would call a different witness. Appellant stated that there was nothing to argue from the psychiatrist's testimony, and that the jury did not understand the psychiatric testimony. The court questioned appellant about his knowledge of evidence and court procedure. The court then denied appellant's motion for self-representation due to untimeliness, the seriousness of the charges, and appellant's ignorance of the law.

When appellant asked for a decision on his motion to strike Dr. Missett's testimony, the court responded that there was no such motion. The public defender stated that the motion was procedural, under his control as counsel and that he was not making such a motion. Appellant then struck his public defender with his fist. Appellant was restrained, but the restraints were removed when appellant promised there would be no further outbursts.

## II.

Appellant contends that reversal of the judgment is required by the trial court's denial of his request for a competency hearing pursuant to section 1368.

Section 1367 states the fundamental rule that "[a] person cannot be tried or adjudged to punishment while such person is mentally incompetent." Section 1367 further states that mental incompetency to stand trial is present "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." Section 1368 in turn requires that if at any time during the pendency of a criminal case a doubt arises as to mental competency, all criminal proceedings must be suspended until a hearing has been conducted to determine whether the defendant is presently mentally competent.

This court has previously defined the preliminary showing of incompetency which is necessary to trigger the mandatory competency hearing procedure of section 1367 et seq. Section 1368 speaks in terms of whether a doubt arises in the mind of the judge, and is then con-

firmed by defense counsel. However, as this court realized 15 years ago in *People* v. *Pennington* (1967) 66 Cal.2d 508, 516-517 [58 Cal.Rptr. 374, 426 P.2d 942] once the accused has come forward with substantial evidence of incompetence to stand trial, due process requires that a full competency hearing be held. (See *Pate* v. *Robinson* (1966) 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836].) Drawing on *Pate* v. *Robinson,* *Pennington* set down standards regarding what constituted substantial evidence of incompetence to stand trial: "If a psychiatrist or qualified psychologist [citation omitted], who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied." (*Id.,* at p. 519.)

The testimony of Dr. Glenn, who was a qualified psychiatrist appointed by the court to examine appellant, satisfied the *Pennington-Pate* substantial evidence test. According to that testimony, appellant suffered from a mental disorder that prevented him from assisting his counsel in his defense in a rational manner. The psychiatrist's opinion was somewhat unusual in that it stated that appellant's problem was with his particular appointed counsel, due to a paranoid delusion focused upon the public defender's office. The psychiatrist also gave the opinion that due to the nature of appellant's mental disorder and the fixation upon the public defender, appellant might well be able to rationally assist a counsel appointed by the court from the private bar.

Based upon this aspect of the psychiatrist's opinion, the trial judge chose to cast the issue in terms of whether there should be a substitution of counsel, while agreeing that appellant "could not cooperate in a rational manner with the Public Defender." When the trial court denied the substitution motion, appellant was left with a counsel whom appellant was unable to rationally assist, according to the court-appointed psychiatrist. All further proceedings were conducted with appellant represented by this counsel.

Respondent contends that a full competency hearing was not required because appellant later stated to the court that he would not accept an attorney who would not contest the identity issue. According to respondent, this statement by appellant was in conflict with statements relied

upon by Dr. Glenn in arriving at his opinion that appellant suffered paranoid delusions about the public defender's office. Respondent contends that these comments totally undermined Dr. Glenn's opinion, and relieved the court of its duty to conduct a hearing.

This contention, if accepted, would permit the trial court to reject substantial psychiatric evidence of an accused's mental incompetence and credit conflicting evidence to deny a hearing on competency. The *Pennington* and *Pate* decisions rejected this line of argument in holding that once substantial evidence in the form of a psychiatric opinion of incompetence was presented, the court was required to hold a competency hearing. The rejection was explicit: "Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses *or the court's own observations of the accused*—may be to the contrary." (*People* v. *Pennington, supra,* 66 Cal.2d at p. 518, italics added.)

Additionally, rather than "undermining" Dr. Glenn's opinion of appellant's limited incompetence, appellant's seemingly increasing resistance to advice from any counsel might well have indicated an even broader-based mental disorder than that found by the psychiatrist. Had either the trial judge or the prosecution believed that appellant's later statements negated Dr. Glenn's opinion, Dr. Glenn could have been recalled to determine if he still adhered to this opinion.

The essential point is that substantial evidence indicating appellant's inability to rationally assist his public defender had been presented. Whether that evidence would be sufficiently well-based to result in a finding of incompetency should have been determined in a full competency hearing conducted as required by sections 1367 and 1368. The existence of other evidence, even if deemed to be in conflict with the substantial evidence of incompetency, does not relieve the court of the duty to conduct a competency hearing.[7]

In the particular circumstances of this case, a substitution of counsel might have avoided altogether the necessity for ordering a full competency hearing. Dr. Glenn's testimony concerning appellant's inability to

---

[7]It is emphasized that appellant's inability to assist his counsel was found by a qualified psychiatrist to be the product of a genuine mental disorder. An accused's refusal to cooperate with a particular appointed lawyer in hopes of obtaining another one would not trigger the necessity of a competency hearing unless a qualified psychiatrist testified that such a refusal was the product of a mental disorder.

cooperate in his defense in a rational manner included strong indications of a breakdown in the relationship between appellant and his state-appointed trial lawyer.

Counsel's own testimony—confirmed by appellant—explicitly indicated the existence of a "fundamental dispute" between counsel and client which "no amount of discussion ... could resolve ...." Given Dr. Glenn's belief that these problems might not arise with different counsel, it is conceivable that a substitution of counsel could have alleviated the entire tangle. At least, this was an alternative which the trial court could have tried in hopes of avoiding any need for a full competency hearing.

The basis of this disagreement was not over some trivial or unimportant matter. It went to the very heart of the trial. As was pointed out in *Brown* v. *Craven* (9th Cir. 1970) 424 F.2d 1166, 1170, "to compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever. [Citations.]"[8]

In view of the state of the record before it, the trial court had to take some action to unravel the fundamental dispute presented to it. The court may not have been required to hold a full competency hearing if the problem could have been resolved by a substitution of counsel. But the court should not have chosen to do nothing at all. Since that is how it responded, this court has no choice but to find this inaction to be error.

The error requires reversal of the judgment. As *Pennington* held, an erroneous pretrial denial of a competency hearing compels reversal of the judgment, since "the trial court has no power to proceed with the trial once a doubt arises" as to the competency of the defendant. (*People* v. *Pennington, supra*, 66 Cal.2d at p. 521.) "In such cases the error is per se prejudicial. Nor, as the United States Supreme Court specifically held in *Pate* v. *Robinson* ..., may the error be cured by a retrospective determination of defendant's mental competence during his trial." (*Ibid.*)

---

[8]*Brown* v. *Craven* granted federal habeas corpus relief to a California state prisoner whose pretrial substitution of counsel motions, which alleged an irreconcilable conflict with appointed counsel, had been denied.

## III.

Since the reversal of judgment is necessitated by the errors discussed above, numerous other contentions of error raised by appellant will not be reached.

The judgment is reversed. The petition for writ of habeas corpus, raising issues decided in *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], is denied for the reasons stated in the *Hovey* opinion.

Mosk, J., and Kaus, J., concurred.

**BROUSSARD,** ██ I concur. I write separately because I would not rest reversal of the judgment solely on the rule that erroneous denial of a competency hearing is reversible error per se. (See *People* v. *Pennington* (1967) 66 Cal.2d 508, 521 [58 Cal.Rptr. 374, 426 P.2d 942].) Instead, I would emphasize the failure of the trial court to take action to prevent "a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." (*People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal. Rptr. 166, 466 P.2d 710]; *People* v. *Williams* (1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008].)

According to Dr. Glenn, the court-appointed psychiatrist, defendant suffered from a paranoid suspicion of the public defender's office which prevented him from cooperating with the deputy assigned to represent him. As the Chief Justice points out, the trial court on hearing that testimony could have initiated a competency hearing under Penal Code section 1368. If defendant were then found incompetent, he would be institutionalized for treatment to overcome his paranoia and enable him to cooperate with the deputy public defender. (See Pen. Code, § 1370.) But if, as Dr. Glenn's testimony indicates, defendant was able to cooperate with private counsel, the costly and time-consuming process of competency hearings, institutionalization, and treatment would be unnecessary; the problem could have been resolved easily by substituting counsel unconnected with the public defender's office.

The trial court neither substituted counsel nor initiated a competency hearing, but required defendant to go to trial in a capital case with counsel with whom he could not cooperate (according to the psychiatric testimony) and whom he did not trust. This breakdown in the attorney-

client relationship led to a defense debacle: counsel would not present the defense of identity which defendant wanted, while defendant would not cooperate with the defense of diminished capacity which counsel preferred—a disagreement so strongly felt that defendant physically struck his attorney when counsel refused to join defendant's motion to strike testimony in support of the diminished capacity defense.

We know from experience that trust and cooperation between client and counsel are essential, that without them even competent counsel may not be able to present an effective case. Thus, "to compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever." (*Brown* v. *Craven* (9th Cir. 1970) 424 F.2d 1166, 1170.) In accord with that reasoning I concur in reversing the judgment in order to enable defendant, on trial for his life, to be represented by counsel with whom he is able to cooperate in presenting a defense.

**NEWMAN, J., Dissenting.**—I believe that the motion for a hearing on appellant's competency to stand trial (Pen. Code, §§ 1367, 1368) was properly denied. The majority conclude that such a hearing was required by Dr. Glenn's testimony in light of the statement in *People* v. *Pennington* (1967) 66 Cal.2d 508, 518-519 [58 Cal.Rptr. 374, 426 P.2d 942], that a psychiatrist's sworn opinion that the accused is incapable of assisting in his defense or cooperating with counsel raises doubt of competency sufficient to require hearing. Yet the subsequent opinion in *People* v. *Laudermilk* (1967) 67 Cal.2d 272 [61 Cal.Rptr. 644, 431 P.2d 228] teaches that doubt of competency must be based on "all the pertinent evidence before the trial court" (67 Cal.2d at p. 286) and not arrived at "by a process of fragmentizing the [expert's] report or fastening attention to isolated parts of it" (*id.*, at p. 288). "Genuine doubt, not a synthetic or constructive doubt, is the measuring rod." (*De Kaplany* v. *Enomoto* (9th Cir. 1976) 540 F.2d 975, 982-983 (in bank).)

The Glenn testimony repeatedly based the doubt of competency on appellant's stating that he would believe advice from a private attorney —but not from the public defender—that the prosecution's evidence was sufficient to convict him.[1] Thus the conclusion of this doctor was

---

[1]Dr. Glenn testified: "He then stated that there definitely was not enough evidence to convict him. And I followed up on that statement by asking him: What if your attorney said that there was enough evidence to convict you? He made the clear statement that

fatally undermined by appellant's ensuing statement, through counsel, that he would reject the advice of any lawyer who refused to contest his identity as the offender rather than presenting only a diminished capacity defense.

It is suggested that the effect of that statement was simply to enlarge the doubt suggested by the expert to encompass an inability to cooper-

---

he would not believe him. That led us into the—he started talking about the Public Defender's Office, and that the Public Defender was different than a regular attorney, that he didn't trust the Public Defender to a point, that he might be working for the District Attorney, and that the Public Defender gets most of his information from the District Attorney, that they work in the same office, they drink coffee together, and that they smile at each other after the proceedings. And I asked, you know, what that meant to him, and to him that means that there was the intimation that there might be some kind of a collusion. I then asked—we talked about the difference between the Public Defender, and he mentioned a Mr. Roger Nuttall, a private attorney, and stated that if he had a private attorney, that kind of thing wouldn't go on. And I asked him what if he had—if he had a private attorney, and that attorney told him a similar thing, that there was enough evidence, for example, to convict him, and he stated that he would believe a private attorney where he would not believe a Public Defender, because of the things that I had mentioned before. He stated private attorneys have more knowledge than Public Defenders, and that a Public Defender is an appointed attorney to him, not someone that he has paid for or asked for himself. He made some specific statement that he does not trust Mr. Sciandra, and then went on to state that the Judge was in it, too, because the Judge could have appointed Mr. Nuttall, if he had wished, but the Judge was giving him a railroad job, and that he wasn't giving him an attorney that had enough knowledge."

"Q: Can you render an opinion to that hypothetical question? A: Yes. I believe he has the mental capacity to analyze the set of facts. What I feel he is lacking is the ability to take that analysis related to the fact that you have stated, or this hypothetical person and apply them to—to his defense, because he stated can I switch back to the real person? THE COURT: Yes. MR. SCIANDRA: Yes, I think it's obvious—THE COURT: That's who we're talking about, so it's all right with me. MR. ARDAIZ: Hypothetically speaking, of course. THE WITNESS: Because he stated to me, you know, flatly that he believes, that he truly believes, that there is not enough evidence to convict him, and that if his attorney, the Public Defender, states that there is, he would not believe him. And if another attorney, privately appointed, told him that same thing, he would believe him, and that's where the delusional system and paranoid thinking comes into effect. The paranoid feelings are related fairly specifically to the Public Defender. Q: Doctor, considering the opinion that Mr. Stankewitz has the conditions you testified to, do you have an opinion as to whether he would be able to rationally aid counsel in his own defense? A: Current counsel? Q: Yes. A: Yes, I do. I don't think he will be able to rationally plan his defense with this counsel. Q: Okay. If a private attorney did give him his opinion that there was enough evidence to convict him, is there anything in your examination which would indicate that Mr. Stankewitz would then develop the same paranoid feelings against this attorney? A: No, there is nothing in my examination that would indicate that. Q: Would that be revealed in further examination? A: Yes. Q: So, it's your opinion that if there was further evaluation, you could come to a determination as to whether or not he would be able to rationally cooperate in his own defense with even a private attorney? A: Well, at this point in time, based upon this examination, I would feel that he could cooperate with a private attorney."

ate with any lawyer. That theory is contradicted, however, by Dr. Glenn's flat statement that "at this point in time, based upon this examination, I would feel that he could cooperate with a private attorney."

The majority argue, "Had either the trial judge or the prosecution believed that appellant's later statements negated Dr. Glenn's opinion, Dr. Glenn could have been recalled to determine if he still adhered to that opinion." (*Ante*, p. 93.) The failure of the public defender to request recall, despite his ardent support of the motion and his familiarity with Dr. Glenn's views from a prehearing interview, indicates that further testimony would not have filled the gap left by appellant's recantation. There was, I submit, no substantial evidence of incompetency to stand trial.[2]

After expounding the need for a competency hearing the majority point to "strong indications of a breakdown in the relationship between appellant and his state-appointed trial lawyer" and suggest that "[t]he court may not have been required to hold a full competency hearing if the problem could have been resolved by a substitution of counsel." (*Ante*, p. 94.) Justice Broussard, concurring, states he would "emphasize the failure of the trial court to take action to prevent a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel. (*People v. Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710]; *People v. Williams* (1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008].)"

The only attorney-client differences shown in the record, however, were over whether to present the identity defense demanded by appellant or the diminished capacity defense that counsel preferred. As *Williams* points out, disagreement about trial tactics does not necessarily call for substitution; and "[w]hether to call certain witness is generally a matter of trial tactics." (*Id.*, at p. 905.) Appellant made clear to the court when he requested substitution on July 5 and August 31 that his only objection to the public defender was the latter's refusal to present an identity defense through witnesses whom appellant wished

---

[2]Subsequent events corroborated the absence of inability to cooperate with counsel. Appellant allowed himself to be examined by the defense psychiatrists and, at the beginning of the defense case, declined an invitation to assert the patient-psychotherapist privilege against defense-expert testimony. The record indicates that he consulted with counsel at appropriate times and behaved properly while the jury was present.

to have called. No other "breakdown" in the attorney-client relation is apparent in or suggested by the record.[3]

Further, the *in camera* hearing in connection with the August 31 motion appears to have convinced the court, with reason, that the identity defense was so untenable that any competent substitute counsel would have rejected it. A trial court should not be required to discharge appointed counsel for refusal to accept a strategy that the court itself has good cause to believe would not be viable.

Richardson, J., concurred.

---

[3]In *Brown* v. *Craven* (9th Cir. 1970) 424 F.2d 1166, relied on by the majority, the trial court "summarily denied the motions [for substitution], making no adequate inquiry into the cause of Brown's dissatisfaction with his counsel or taking any other steps which might possibly lead to the appointment of substitute counsel in whom Brown could repose his confidence." (*Id.*, at p. 1169.) Here the requirements for such an inquiry (see *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]; *People* v. *Lewis* (1978) 20 Cal.3d 496 [143 Cal.Rptr. 138, 573 P.2d 40]) were fully satisfied.