[Crim. No. 22206. Feb. 25, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
BRIAN DARLE HALE, Defendant and Appellant.

**COUNSEL**

Bradley S. Phillips, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Gary R. Hahn, Robert F. Katz and Marc E. Turchin, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LUCAS, C. J.—Defendant was charged with two counts of first degree murder (Pen. Code, § 187),[1] one count of robbery (§ 211), and one count of attempted robbery (§§ 211, 664). Each of the two murder counts was accompanied by a special circumstance finding of robbery murder (§ 190.2, subd. (a)(17)(i)) and multiple murder (§ 190.2, subd. (a)(3)), and in each of the four counts it was found that defendant used a firearm within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1). This appeal under the 1978 death penalty law is automatic. (§ 1239, subd. (b).) Because the trial court failed to hold a competency hearing pursuant to section 1368 after specifically ordering one,[2] the entire judgment must be reversed.

## I. FACTS

### A. *Clarence Temple Murder*

In the early morning hours of October 2, 1980, Clarence Temple, 63 years old, left his home in Bellflower to take his daily walk before work. Temple customarily took his billfold containing a driver's license, credit cards and social security card. On the morning of his murder, Temple had between $100 and $150 with him. At 5:23 a.m., Richard Tamplen was on his way to the bus stop when he found Temple lying face down on the sidewalk near Rosecrans and Lakewood Boulevards. No one else was present. Tamplen noticed a stream of blood running from Temple's head, and notified police after observing no signs of life.

A Los Angeles deputy sheriff arrived at the scene and noticed what appeared to be a gunshot wound to the base of Temple's neck on the left side below and behind the ear. A .22-caliber shell casing was found near Temple's body. The casing was taken to the sheriff's crime laboratory for ballistics testing. The right rear pocket of the victim's pants was partially pulled out and no wallet was found.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] Section 1368 provides, in relevant part, "(a) If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . . [¶] (b) If *counsel informs the court that he believes the defendant is or may be mentally incompetent,* the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. . . . [¶] (c) Except as provided in Section 1368.1, when an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined. . . ."

The following day, after removing an expended .22-caliber bullet from Temple's body, the medical examiner determined that the cause of his death was a gunshot wound entering the neck and traveling into the head. The bullet was delivered to the sheriff's crime laboratory for testing.

### B. *Herman Silber Murder*

On October 8, 1980, 69-year-old Herman Silber was shot to death in the parking lot of the Cerritos Mall. Andrea Nelson, an employee at the Cerritos Mall, was conversing with a fellow employee when she observed defendant and Silber together in the parking lot. While driving out of the lot, Nelson felt a large shock; she described it as a backfire. When she glanced in the car's rearview mirror, she saw Silber slumping down between the cars and falling to the ground, and noticed defendant rummaging through Silber's pockets. Nelson then backed her car until she could see Silber on the ground and defendant, who was kneeling, looking up at her.

Nelson identified defendant to Walter Kerr, who was walking outside the mall with his wife. Defendant left the area on foot and both Nelson and Kerr attempted to follow him,[3] but they eventually returned to the scene and provided the police with a description. A short time later, a deputy sheriff detained defendant on a street near the Cerritos Mall and found a small .22-caliber sterling automatic handgun in his possession. Nelson and Kerr identified defendant to police officers at the scene of his arrest. They were positive that defendant was the same man they had observed at the scene of the murder. Defendant was then arrested.

Deputy Sheriff Christensen, a firearms identification examiner, studied the expended bullets and cartridge cases from both the Temple and Silber murders. Christensen concluded that the bullet obtained from Temple's body and the shell casing found near Silber's body were both from defendant's gun. The expended bullet removed from Silber's body, however, was too distorted to allow a positive identification comparison.

### C. *The Preliminary Hearing and Arraignment*

On October 20, 1980, a preliminary hearing was held at which defendant exhibited abnormal and bizarre behavior.[4] The magistrate initially contin-

---

[3] At the guilt phase, Kerr testified that once defendant realized he was being followed, he turned around and threatened Kerr by stating, "Stop. I'm carrying. Do you understand?" Defendant then showed Kerr the same gun used in the Silber murder and walked away.

[4] The following colloquy occurred at the outset of the hearing: "THE COURT: All right, this is the case of the People of the State of California versus Brian Darle Hale. [¶] THE

ued the matter and appointed two psychiatrists to examine defendant pursuant to section 1368, but later vacated the appointments and proceeded to a preliminary hearing that same day. During the hearing, defendant continued to make bizarre comments and was shackled with leg and waist chains throughout the proceeding. After defendant was held to answer, he was admitted to the psychiatric unit of the Los Angeles County jail and treated with antipsychotic medication.

At defendant's arraignment on November 3, 1980, he again made inappropriate and bizarre responses. Following the prosecutor's reading of charges and in response to the court's request for waiver of further reading of the information and a statement of constitutional rights, defendant stated: "I don't waive. I say I plead guilty to five counts." Defense counsel then indicated: "As to the plea, there's to be a reference to the defendant under 1368 for an examination." The prosecutor responded that the motion was "well taken." The court then declared a doubt as to defendant's present mental competency based on his conduct and demeanor in the courtroom.[5]

DEFENDANT: My Honor, His Honor. Hey, it's not His Honor, it's my Honor. Sit Down. It's My Honor, not His Honor. And you people, you can't restrain me, you liars. Just sit down. I have been hurt, you understand, I have been hurt. What are the charges? [¶] MR. WILLIAMS: The Judge is going to tell you. [¶] THE DEFENDANT: I heard 'murder,' you liars. That's not the question I asked. I say for me being restrained like this in court. Hey, Fatso, what are the charges? [¶] MR. WILLIAMS: May I have a moment please, your honor? [¶] THE DEFENDANT: I heard, Fatso, and this is not legal. Hey, Fatso do you realize I am a president? I just heard sounds pass. That means I have little speakers in my ears, and not just to let little sounds pass. I call that illegal. Do you know what I mean? [¶] MR. WILLIAMS: Do you want to know what the charges are, or not? Is that what your question is? [¶] THE DEFENDANT: I asked you, do you know what I mean? It's illegal to entrap me. Okay? I agree, it's illegal to entrap me. I heard you agree. [Counsel conferred with the defendant off the record.] He stuck his finger in his ear. No way. You're lucky not to get your brains blown out, you're going to get tortured for life. You are also holding a blue pen. Are you a homosexual?"

[5] Specifically, the court stated: "In this matter I have observed the conduct and demeanor of the defendant in the courtroom. The record will reflect, hopefully, as much as possible, the statements, many of which appear to be inappropriate conduct, and his manner and demeanor, his speech, has caused a doubt to arise in the mind of the Court as to his present mental competency. I'll state that doubt for the record." The following colloquy then took place between defense counsel, Mr. Tolmas, defendant and the court: "THE DEFENDANT: I am under drugs that I don't want to use. [¶] THE COURT: Mr. Tolmas, is it your opinion that the defendant is incapacitated, or mentally incompetent pursuant to [s]ection 1368? [¶] MR. TOLMAS: Yes, Your Honor. [¶] THE COURT: To the extent that you feel that he's either unable to understand the nature of the proceedings, or to assist you in the conduct of his defense in a rational manner. [¶] MR. TOLMAS: Yes, your honor. [¶] THE DEFENDANT: How about my out, like O.R.? I direct that to you, Your Honor. [¶] THE COURT: That—any motion under O.R. is denied. [¶] THE DEFENDANT: Not from it it isn't, and I'm a judge of higher quality than you. [¶] THE COURT: Mr. Hale, I advise you at this time that I've expressed a doubt as to your mental capacity to stand trial. I'm going to appoint two doctors that will conduct psychiatric examinations of you and report back to the Court in writing. They'll examine you at the Los Angeles County Jail. It's my duty to advise you as to certain constitutional rights

Defense counsel responded affirmatively to the court's inquiry whether, in counsel's opinion, defendant was incapacitated or mentally incompetent pursuant to section 1368 such that he was either unable to understand the nature of the proceedings or to assist in the conduct of his defense in a rational manner.

The court initially appointed two psychiatrists, Drs. Saul Faerstein and Walter Hofman, to examine defendant at the county jail and to report their findings in writing to the court. The matter was then continued to December 3, 1980, for a hearing "on the question of the defendant's present mental competency." Evidently, the hearing was never held.[6]

### D. *The Psychiatric Reports*

#### 1. *Dr. Faerstein*

Dr. Faerstein submitted his report on November 24, 1980, and reached the following conclusions regarding defendant's present mental condition: "1. The defendant is presently not competent to stand trial. The defendant does not understand the nature and purpose of the legal proceedings, and he is unable to cooperate in a rational manner with counsel in presenting a defense. 2. The defendant is presently psychotic. . . . [H]e is so impaired at the present time that it is not possible to discuss the instant offenses adequately to reach a conclusion with reasonable medical certainty concerning his mental state and criminal responsibility at the time of the commission of the instant offenses."

#### 2. *Dr. Hofman*

Defendant was examined by Dr. Hofman on December 2, 1980, approximately three weeks after Dr. Faerstein's examination. Dr. Hofman ex-

---

and statutory rights you have. [¶] THE DEFENDANT: Statutory rape. [¶] THE COURT: You are entitled to an attorney at all stages of the proceedings. [¶] Mr. Tolmas, will you be able to continue to represent Mr. Hale—[¶] THE DEFENDANT: Is she involved? [¶] THE COURT: — through the 1368? [¶] MR. TOLMAS: Yes, your Honor. [¶] THE DEFENDANT: Sixty, sixty three. [¶] THE COURT: Mr. Hale, you are also entitled to a speedy determination on this issue. You are entitled to a public trial. You are entitled to confront, that is to face and to hear all witnesses who may testify against you, and you have the right, through your attorney, to cross-examine each witness. You have the right to present evidence in your behalf."

[6]On December 3, 1980, the matter was continued to December 10. On December 10, a third psychiatrist was appointed and the matter was continued to January 6, 1981. On January 6, no mention of a section 1368 hearing was made and the matter was continued to January 27. On January 27, again no mention of a section 1368 hearing was made, although defendant entered a plea of not guilty by reason of insanity on that date. Thereafter, defendant's competence to stand trial was not mentioned in the recorded proceedings.

pressed the opinion that "[defendant] is able to understand the nature and the purpose of the proceedings against him and to cooperate with counsel in presenting a defense. . . ." The doctor noted, however, that defendant was "deeply entrenched in a delusional system with some improvement in that he has been on medication."

### 3. *Dr. Davis*

The trial court, at defendant's request, appointed a third psychiatrist, Dr. Davis, to examine defendant. In a report dated December 30, 1980, Dr. Davis concluded that defendant suffered from "schizophrenia, paranoid type," but that he was in remission because of medication given at the Los Angeles County jail hospital. Dr. Davis opined that defendant was competent to stand trial although he felt defendant "was insane at the time he committed the offenses," he "should be committed to a state hospital," and that defendant "is a danger to the safety of others."

### 4. *Further Proceedings*

After Dr. Davis submitted his psychiatric report, defendant's case was called for trial as scheduled on January 6, 1981. Defense counsel requested a continuance to January 27, 1981, in order to discuss some matters with the assigned prosecutor who was not then in court. The trial court granted the continuance.

On January 27, 1981, the court appointed two additional psychiatrists to examine defendant: Drs. Moskowitz and Stalberg. In its "Letter of Psychiatric Appointment," the court specifically requested both doctors to make section 1368 findings (i.e., to determine whether defendant was "presently able to understand the nature and purpose of the proceedings taken against him" and whether defendant was "presently able to cooperate in a rational manner with counsel in presenting a defense"). Accordingly, we must assume that as of this time the issue of defendant's competency had not yet been resolved by the court.

### 5. *Dr. Moskowitz*

Dr. Moskowitz submitted his report to the court on February 14, 1981. His examination revealed that defendant suffered from chronic paranoid schizophrenia. Dr. Moskowitz concluded that defendant "has not fully recovered his sanity," and that "[h]e cannot cooperate in a rational manner with counsel in preparing a defense."

### 6. *Dr. Stalberg*

On February 16, 1981, Dr. Stalberg reported that defendant was "competent to stand trial." Specifically, Dr. Stalberg opined that defendant "[s]howed none of the bizarre, psychotic behavior, thinking or emotions that he has evidenced in past examinations and at his preliminary hearing. He was able to rationally describe the functioning of the court, stating that 'At first I had a Public Defender for my pretrial arraignment and preliminary hearing.' He stated that now he has privately retained counsel, and he presumes his trial will begin upon his next day in court."

Finally, Dr. Stalberg attempted to account for the conflicting psychiatric reports by reasoning, "it appears that Dr. Faerstein examined the defendant early in the defendant's treatment, on 11-12-80, when the antipsychotic medication had not yet taken effect and [defendant] was very psychotic. By the time of the examinations of Drs. Hofman and Davis, in early and late December, 1980, the medication had effectively reduced [defendant's] psychotic thinking to render him competent to stand trial." Dr. Stalberg's evaluation, however, fails to account for Dr. Moskowitz's incompetency finding.

Both the People and defendant acknowledge that although the trial court and counsel initially had anticipated a hearing on the competency issue, no such hearing was ever held, and the issue was never resolved on the record. The record reveals that the court never commented on the reports of the appointed psychiatrists regarding defendant's competency, nor did the court ever again mention the ordered section 1368 hearing or its earlier express finding of a doubt as to defendant's competency. The proceedings continued to trial without any objection from defense counsel.

## II. PRETRIAL COMPETENCY ISSUE

 Defendant persuasively argues that the court's failure to hold a competency hearing pursuant to section 1368 constituted a denial of due process under *Pate* v. *Robinson* (1966) 383 U.S. 375, 377 [15 L.Ed.2d 815, 817-818, 86 S.Ct. 836]. Specifically, defendant contends that the failure to hold a competency hearing before trial, following the court's explicit expression of doubt as to defendant's competency and its subsequent order requiring a section 1368 hearing, cannot be cured by a retrospective appellate determination of his probable competence to stand trial. Rather, defendant asserts, the conviction must be set aside and, if the prosecution wishes to retry him, a hearing must be held to determine his *present* competence. The

People respond that a competency hearing was not required in this case because defendant failed to present substantial evidence of his mental incompetence as required under *Pate* and our decision in *People* v. *Pennington* (1967) 66 Cal.2d 508, 516-517 [58 Cal.Rptr. 374, 426 P.2d 942]. We disagree.

■ It has long been established that the conviction of an accused person while he is legally incompetent violates due process. (*Pate, supra,* 383 U.S. at p. 377 [15 L.Ed.2d at pp. 817-818].)[7] Indeed, the United States Supreme Court has held that the failure of a trial court to employ procedures to protect against trial of an incompetent defendant deprives the defendant of his due process right to a fair trial and requires reversal of his conviction. (*Ibid.*; *Drope* v. *Missouri* (1975) 420 U.S. 162, 171 [43 L.Ed.2d 103, 112-113, 95 S.Ct. 896].)

Prior to the decision in *Pate,* we had interpreted section 1368 to permit a trial judge, in determining whether to conduct a competency hearing, to resolve conflicting evidence concerning a defendant's competence to stand trial. (*People* v. *Merkouris* (1959) 52 Cal.2d 672, 678 [344 P.2d 1].) ■ In *Pennington,* however, we specifically reinterpreted section 1368 and held, "*Pate* v. *Robinson* stands for the proposition that an accused has a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or assisting in his defense. Once such substantial evidence appears, a doubt as to the sanity of the accused exists, *no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary* . . . . [¶] [W]hen defendant has come forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing as a matter of right under *Pate* v. *Robinson, supra,* 383 U.S. 375. *The judge then has no discretion to exercise.*" (*Pennington, supra,* 66 Cal.2d at p. 518, italics added.) Moreover, our subsequent decisions have consistently held that despite the discretionary nature of the language of section 1368, a competency hearing is required when substantial evidence of the accused's incompetence has been introduced. (*People* v. *Stankewitz* (1982) 32 Cal.3d 80, 91-92 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476]; accord, *People* v. *Laudermilk* (1967) 67 Cal.2d 272, 283 [61 Cal.Rptr. 644, 431 P.2d 228].)[8] We see no reason to hold otherwise under the facts presented here.

---

[7] *Pate* held, "[w]here the evidence raises a '*bona fide* doubt' as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a [competency] hearing . . . ." (*Pate, supra,* 383 U.S. at p. 385 [15 L.Ed.2d at p. 822].)

[8] In *Laudermilk,* we held that mere bizarre behavior did not amount to the requisite substantial evidence requiring the court to provide a hearing under section 1368. (67 Cal.2d at

Section 1368 provides that if "a doubt arises in the mind of the judge as to the mental competence of the defendant," the court shall inquire of defense counsel regarding his client's competence and, if counsel believes that defendant may be incompetent, the court shall order a hearing on the matter. The section further provides that even if defense counsel believes that his client is competent, the court may, in its discretion, order such a competency hearing. Once the hearing is ordered, *all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined.*" (§ 1368, subd. (c), italics added.) ■ In the present case, there were enough indications of defendant's mental and emotional instability to trigger the trial court's sua sponte obligation to order a competency hearing. Once the trial court ordered the hearing, as it reasonably did, it could not simply vacate the order, sub silentio.

The People present several arguments in rebuttal, none of which convinces us a competency hearing was not required under the facts of this case. First, the People argue that a competency hearing was not required because substantial evidence of defendant's incompetence to stand trial did not appear at the preliminary hearing. We cannot agree.

Of the five psychiatrists who examined defendant by court appointment, two concluded that he was not competent to stand trial. The other three disagreed, although at least two of those doctors observed schizophrenic behavior in defendant and believed he should be committed to a state hospital. Unquestionably, these psychiatric reports (particularly when considered in light of the court's expression of doubt as to defendant's competency and defendant's history of mental illness and bizarre behavior at pretrial hearings) constituted "substantial evidence" within the ambit of section 1368.

In a related context, the People assert that the "change in defendant's mental condition" before trial "obviated the need for a competency hearing." This argument is misplaced. As stated earlier, section 1368 "requires that if at any time during the pendency of a criminal case a doubt arises as to mental competency, all criminal proceedings must be suspended *until a hearing has been conducted to determine whether the defendant is presently*

pp. 283, 285.) We stated, "Since neither an abuse of discretion nor a doubt as a matter of law can possibly appear absent substantial evidence of incompetence, appellate court inquiry need go no further than a determination of whether such substantial evidence was adduced." (*Id.,* at p. 283, fn. 10.)

*mentally competent.*" (*Stankewitz, supra,* 32 Cal.3d at p. 91, italics added.) Indeed, once a doubt has arisen as to the competence of the defendant to stand trial, the trial court has no jurisdiction to proceed with the case against the defendant without first determining his competence in a section 1368 hearing, and the matter cannot be waived by defendant or his counsel. (*Pennington, supra,* 66 Cal.2d at p. 518; *In re Davis* (1973) 8 Cal.3d 798, 808 [106 Cal.Rptr. 178, 505 P.2d 1018].)

 Further, even if we were to assume hypothetically that the court's initial expression of doubt as to defendant's competence was mitigated by defendant's stabilization through drug therapy, the fact that Drs. Davis, Hofman and Stalberg submitted reports indicating defendant was competent to stand trial did not permit the trial court to vacate or otherwise ignore its previous order for a section 1368 hearing. Such a contention, if accepted, would allow the court on its own motion and without a full airing of the evidence to "reject substantial psychiatric evidence of [defendant's] mental incompetence [i.e., the reports submitted by Drs. Faerstein and Moskowitz] and credit conflicting evidence to deny a hearing on competency. The *Pate* and *Pennington* decisions rejected this line of argument in holding that once substantial evidence in the form of a psychiatric opinion of incompetence was presented, the court was required to hold a competency hearing." (*Stankewitz, supra,* 32 Cal.3d at p. 93; *Pennington, supra,* 66 Cal.2d at p. 518.)

Finally, the People insist that defense counsel abandoned the competency issue after determining that pursuit of the issue would be fruitless. Such an argument, however, overlooks the fact that the matter is jurisdictional, and cannot be waived by counsel. (*Pennington, supra,* 66 Cal.2d at p. 521; § 1368, subd. (c).) Moreover, as pointed out in *Pate, supra,* 383 U.S. at page 384 [15 L.Ed.2d at p. 821], "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial."

In sum, substantial evidence indicating defendant's inability to understand the nature of the proceedings and rationally assist his counsel had been presented at the preliminary hearing. The court explicitly demonstrated its own doubt as to defendant's competence and ordered a section 1368 hearing. The sub silentio disposition of the section 1368 proceedings without a full competency hearing rendered the subsequent trial proceedings void because the court had been divested of jurisdiction to proceed pending express determination of the competency issue.

The judgment is reversed and the cause remanded for further proceedings pursuant to section 1368 to determine defendant's present competency to stand trial.

Mosk, J., Broussard, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.