Filed 9/30/15  P. v. Alfaro CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JULIO OBALDO ALFARO,<br><br>　　　Defendant and Appellant. | B256607<br><br>(Los Angeles County<br>Super. Ct. No. BA384998) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Monica Bachner, Judge.  Affirmed in part, modified, and remanded.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, Mary Sanchez, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant Julio Obaldo Alfaro (defendant) was convicted of attempted murder (Pen. Code, §§ 664 and 187, subd. (a)[1]) and assault with a semiautomatic firearm (§ 245, subd. (b)).  On appeal, defendant contends that the trial court abused its discretion in denying his numerous *Marsden*[2] motions; the trial court erred by instructing the jury with CALCRIM No. 3472; an error in the calculation of his presentence credits should be corrected; and the abstract of judgment should be amended to reflect that he was convicted by jury instead of by plea.  We remand the matter for the trial court to modify the judgment and amend the abstract of judgment to reflect that defendant is entitled to receive a total of 1,259 days of custody credit, and to amend the abstract of judgment to reflect that defendant was convicted by a jury.  We otherwise affirm the judgment.

## BACKGROUND

### A.      Factual Background

#### 1.      *Prosecution Evidence*

73-year-old Juan Jose Rodriguez (Juan Jose)[3] testified that he was standing outside of his apartment building with a friend, Jose Elias Rodriguez (Jose Elias).[4]  Defendant approached Juan Jose as he was unlocking the gate to his apartment building.  Juan Jose knew defendant, but never had any disputes with him prior to that date.  Defendant insulted Juan Jose, calling him a "son of a bitch," and accused him of "saying crazy

---

[1]      All statutory citations are to the Penal Code unless otherwise noted.

[2]      *People v. Marsden* (1970) 2 Cal.3d 118.

[3]      Juan Jose is sometimes referred to in the reporter's transcript as Don Juan.

[4]      In his briefs, defendant refers to Jose Elias as Juan Elias.

2

things about" defendant. Juan Jose told defendant that he never talks about defendant. Defendant "came up" to where Juan Jose was standing, and Juan Jose "put [his] hands out to create distance, because [defendant] was angry" and Juan Jose "didn't want [defendant] to [lunge] at" him. Juan Jose put his hands against defendant's chest and defendant became "quiet." Juan Jose then took his key and again tried to unlock the gate while also looking at defendant. Juan Jose felt a bullet strike him in the left side of his stomach. Juan Jose did not remember anything thereafter through the time he was released from the hospital. Juan Jose did not see defendant holding a gun. Juan Jose denied hitting, physically attacking, or choking defendant prior to the shooting.

Jose Elias testified that he saw defendant approach Juan Jose but he did not know what they said to each other, and did not "see" any conversation or physical contact between the two. Jose Elias saw defendant move his hand toward his waist, pull out a weapon, and fire the weapon at Juan Jose. Defendant was about one-half to one foot away from Juan Jose when he fired the weapon. Jose Elias said the weapon was a black or gray colored semiautomatic handgun. When defendant fired the weapon, it ejected a shell casing that landed near Jose Elias. After shooting Juan Jose, defendant placed the weapon in his waistband and left the area. Jose Elias had known Juan Jose for fifteen years and had known defendant for a "long time" prior to the shooting. Jose Elias had never had any problems with defendant prior to the shooting, and he had never seen Juan Jose and defendant engage in any argument prior to that day.

The police arrested defendant later that afternoon, approximately one or two blocks from the shooting. Defendant was searched and the police found a semiautomatic pistol with a gold finish in defendant's waistband. The police located a shell casing at the scene of the shooting.

3

## 2. Defendant's Evidence

Defendant testified that he lived in the same apartment building in which Juan Jose lived. A short time before the shooting incident, defendant had a stroke and half of his body was impaired. Defendant said he walked "as if [he] were drunk." Defendant also suffered a "brain injury" and had difficulty remembering things. On the day of the shooting, he had a gun with him because he was thinking of killing himself. More than a year prior to the incident, defendant found the gun in a trash can. He kept it in "a hiding place" in the maintenance room of the building. He testified that there was no "particular reason" that he kept the gun; he did not regularly carry the gun; and the day of the incident was the first time that he carried the gun.

On the day of the incident, defendant testified that he saw Juan Jose entering the building and told him that he wanted to speak to him. Juan Jose did not respond and continued to enter the building. Juan Jose "came out [of the building] all of a sudden" and "assaulted" defendant, which was "easy" because "half of [defendant's] body [was] impaired." Defendant testified that Juan Jose "grabbed" him, pushed him against a hand rail, and Juan Jose put his hands on defendant's neck. Defendant said that he was "very, very, very scared" and he defended himself with the gun. Defendant admitted that he shot at Juan Jose, but did not know why he fired the gun. Defendant testified that he was trying to "get [Juan Jose] away from" him. According to defendant, he was unable to push Juan Jose away from him because defendant was paralyzed on the left side of his body. Defendant said he did not know why he left the scene after the shooting; he was not thinking straight.

Defendant testified that he never had "any argument with Don Juan," and he was not angry with him. Defendant does not recall speaking with police officers after the incident, or of advising them that Don Juan choked him.

## 3. Rebuttal Evidence

The parties stipulated a police officer would testify that defendant told him on the day of the shooting that: "[Defendant] heard his friend call victim [Juan Jose] and

4

overheard [that] they were going to meet up. [Defendant] saw this as an opportunity to confront the victim about talking bad about him, spreading rumors. [Defendant] said he attempted to confront the victim. When the victim told [defendant] that he was going to beat him up and called him a son of a bitch, the victim pushed [defendant] with both hands, knocking him back on to the railing of the stairs of [the apartment building]. The victim stumbled back and then [defendant] lost control of his thoughts, pulled out the pistol he had in his left rear waistband and fired one shot at the victim. He was asked about the handgun he used and [defendant] stated he found it six to seven years ago in the Echo Park area in a trash can. He retrieved it and hid it on the property belonging to his father at [the apartment building]. Today, [defendant] retrieved the handgun because he had suicidal thoughts. [Defendant] stated he had a stroke approximately nine days ago and was admitted to USC Medical Center. He was released on Thursday, May 26th. He is emotionally distraught over him not being able to use the left side of his body and can no longer work, and stated he feels useless. He has had an ongoing dispute with the victim over the victim spreading rumors about him."

### B. Procedural Background

Following trial, the jury found defendant guilty of attempted murder in violation of sections 664 and 187, subdivision (a) (count 1) and assault with a semiautomatic firearm in violation of section 245, subdivision (b) (count 2). As to count 1, the jury found not true an allegation that the attempted murder was committed willfully, deliberately, and with premeditation, and found true enhancement allegations of personal use of a firearm as defined by section 12022.53, subdivisions (b)-(d) and an enhancement allegation of great bodily injury as defined by section 12022.7, subdivision (c). As to count 2, the jury found true an enhancement allegation of the great bodily injury as defined by section 12022.7, subdivision (c) and an enhancement allegation of the personal use of a firearm as defined by sections 12022.5, 1192.7, subdivision (c) and 667.5, subdivision (c).

5

The trial court sentenced defendant to state prison for a term of 30 years to life, consisting of a term of five years on count 1 plus 25 years to life pursuant to section 12022.53, subdivision (d). The trial court imposed and stayed sentence on count 2 pursuant to section 654. The trial court awarded defendant custody credit, and ordered him to pay various fees, fines and penalties. Defendant filed a timely notice of appeal.

## DISCUSSION

### A. *Marsden* Motions

Defendant contends that the trial court abused its discretion in denying his numerous motions made pursuant to *People v. Marsden*, *supra*, 2 Cal.3d 118. We disagree.

#### 1. *Standard of Review*

We review a trial court's decision to deny a *Marsden* motion under the deferential abuse of discretion standard. (*People v. Taylor* (2010) 48 Cal.4th 574, 599.) "Denial is not an abuse of discretion 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' (*People v. Smith* [(2003)] 30 Cal.4th [581,] 604.)" (*People v. Taylor, supra,* 48 Cal.4th at p. 599; *People v. Panah* (2005) 35 Cal.4th 395, 431.)

#### 2. *Applicable Law*

A defendant who believes that his appointed counsel is providing ineffective assistance may seek to have that counsel relieved and substitute counsel appointed through "what is commonly called a *Marsden* motion." (*People v. Smith*, *supra*, 30 Cal.4th at p. 604.) To prevail, the defendant must make """"a substantial showing"""" that denial of his *Marsden* motion is likely to result in """"constitutionally inadequate representation."""" (*People v. Streeter* (2012) 54 Cal.4th 205, 230.) Our Supreme Court stated, "A defendant must make a sufficient showing that denial of substitution would

6

substantially impair his constitutional right to the assistance of counsel (*People v. Smith* (1985) 38 Cal.3d 945, 956 [216 Cal.Rptr. 98, 702 P.2d 180]), whether because of his attorney's incompetence or lack of diligence (*In re Banks* (1971) 4 Cal.3d 337, 342 [93 Cal.Rptr. 591, 482 P.2d 215]; *People v. Crandell* (1988) 46 Cal.3d 833, 854 [251 Cal.Rptr. 227, 760 P.2d 423]), or because of an irreconcilable conflict (*People v. Stankewitz* (1982) 32 Cal.3d 80, 93-94 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476]; *Brown v. Craven* (9th Cir. 1970) 424 F.2d 1166, 1170). We require such proof because a defendant's right to appointed counsel does not include the right to demand appointment of more than one counsel, and because the matter is generally within the discretion of the trial court. (*People v. Marsden*, *supra*, 2 Cal.3d at p. 123.)" (*People v. Ortiz* (1990) 51 Cal.3d 975, 980, fn.1.)

A trial court does not err in denying a *Marsden* motion based on a defendant's complaints of his counsel's inadequacy amounting to tactical decisions. (*People v. Dickey* (2005) 35 Cal.4th 884, 922.) "'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 729.)

### 3. *Relevant Proceedings*

#### a) December 14, 2012, hearing

On December 14, 2012, defendant initially requested that he be permitted to represent himself,[5] but upon the trial court having admonished him on the disadvantages of self-representation, defendant requested that the trial court appoint a different attorney instead of his current counsel, deputy public defender Ms. Gia Bosley. Defendant stated that he would like another attorney because "the alleged victim," Juan Jose, did not tell the truth at the preliminary hearing and Ms. Bosley should have obtained his vision and

---

[5] On several occasions, defendant asked the trial court to permit him to represent himself.

7

hearing records; defendant wanted Ms. Bosley "to bring in the Mexicans who know very well what happened" and "they would be able to let you know who I am"; and "[w]hen [defendant] tried to tell her the man was saying no because you bang, and they told [defendant] about what [defendant] did, [defendant] wanted to talk [to Ms. Bosley more about my testimony] and [defendant] couldn't."

Ms. Bosley responded by stating that the victim's vision and hearing were "not . . . relevant to the case" because "there's no testimony or evidence . . . from what I understand . . . that anything was said to the victim prior to being shot," and [defendant and the victim have] know[n] each other [for a significant period of time] so there's no issue of an I.D. . . ."; defendant had given her the names of some witnesses, her investigator had spoken to them, and some of the information they provided was "good" and some of it was "not good for [defendant's] case"; she had discussed with defendant his options regarding testifying, but told him that they did not have to make a decision about that at the time; she had appointed several experts regarding whether defendant was "competent" and whether the stroke "that he suffered could have had any relation to his subsequent conduct"; she discussed with defendant whether a handwritten statement he made shortly after the shooting was accurate and whether it was his writing; and she met with defendant outside of court prior to his being "declared competent," "at least five times" outside of court since then, and had several conversations with him when they were in court.[6] The trial court denied defendant's *Marsden* motion, finding that Ms. Bosley had been adequately representing defendant, and the ultimate decision about what records to subpoena and what witnesses to call were for the attorney to make.

---

[6] Ms. Bosley said that "there was at least one occasion where I was told by the Sheriff's Department that [defendant] refused to come to speak with me in terms of us preparing the case." There is no evidence of why defendant refused to speak to her.

8

b)      January 28, 2013, hearing

On January 28, 2013, the trial court stated that defendant had written a letter to the court alleging that he had a conflict of interest with Ms. Bosley, and the trial court confirmed that defendant was making another *Marsden* motion.  At the confidential hearing however defendant stated that he did not have a conflict of interest and he "only wanted to" represent himself.  The trial court "concluded" the *Marsden* hearing "because it appears it is not actually a *Marsden*."

c)      April 9, 2014, hearing

On April 9, 2014, defendant made another *Marsden* motion, stating that he would like another attorney because he was not given the police report until two years after he had been detained; Ms. Bosley's investigator had fabricated a case against him because Ms. Bosley "brought me to the investigator without telling me that he was my investigator"; he had asked for and not received "the transcriptions of all the court dates, the doctor's reports and the charges from the D.A."; he had asked Ms. Bosley "many times" for her help in comparing the preliminary hearing transcript with the police report; and Ms. Bosley had not let him select the jurors during the competency proceedings.

Defendant conceded that at the time of the April 9, 2014, hearing, he had seen the police report.  Defendant also stated that he had "lost" the doctor's report, the preliminary court "date" and "the police report."  The trial court explained to defendant that "it is typically the practice of attorneys not to give all the papers to the defendant because of a concern that the papers would be lost or taken by someone else."

Ms. Bosley responded to defendant's statements by stating that her investigator interviewed "all the witnesses" and also interviewed people at defendant's request; she had met with defendant on "numerous occasions," and had met with him on "no less than" seven occasions to prepare him to testify if he chose to do so; on three occasions she gave defendant copies of discovery but he "repeatedly lost" them," and that day she gave defendant "an additional copy" of the discovery so he could prepare for trial; she had "repeatedly" given defendant the jury instructions in both English and Spanish so

9

that he could study them; although defendant was very concerned that some witnesses' statements were not true and he did not want those statements to come into evidence, she explained to him that the prosecution subpoenaed the witnesses and it was for the jury to determine the credibility of the witnesses; her investigator has never met with defendant, had "no opinion" on defendant "one way or another," and the investigator "only documented what other people have said about the situation and [defendant]"; she advised defendant that she could "point out discrepancies" between the police report and the preliminary hearing transcript during the trial, but it would not assist defendant in preparing for his testimony; and selecting the jurors during the competency proceedings was a decision for her to make, and defendant wanted jurors who were unavailable.

The trial court told defendant that Ms. Bosley was well prepared for trial, the investigator was working on defendant's behalf, and Ms. Bosley was prepared to continue to give defendant documents even though he previously lost the documents Ms. Bosley had given him. It denied defendant's *Marsden* motion finding that Ms. Bosley was adequately representing defendant.

d) April 22, 2014, hearing

At the April 22, 2014, hearing, defendant made another *Marsden* motion, stating that he wanted to replace Ms. Bosley with another attorney because: Ms. Bosley "made" him sign "many documents" when defendant was not in his "right mind"; he wanted a different attorney who would "investigate everything that [had] happened to [him]"; Ms. Bosley was "fabricating something against" him because she told him that the investigator had family that was close to the witnesses with whom he sent the investigator to speak and they were "false witnesses"; he asked Ms. Bosley to look at "the witness" because he was "missing one eye" and that there was a discrepancy between "the report" and testimony at the preliminary hearing, but Ms. Bosley "didn't want to" do it; and Ms. Bosley "changed courts on a temporary basis" and told defendant "when he was in court to sign a paper."

10

Ms. Bosley responded to defendant's statements by stating that her investigator had interviewed "all of the witnesses" in the area of whom she was aware, not just the witnesses to the actual shooting; she reviewed the medical records of defendant and the victim; she had met with defendant on numerous occasions, including meeting with him to discuss the results of her investigations, discuss his possibly testifying, and on at least two occasions to give him discovery; she had given defendant copies of the jury instructions, including the instructions for "certain defenses"; she had advised defendant that in order to have the jury instructed on those defenses, defendant would have to testify; the only document that defendant had signed was a stipulation for a commissioner to hear the preliminary hearing and "he probably signed a release for the medical records so I could review them"; "[defendant] feels that the information [the] witnesses gave to my investigator was false," and defendant "is basically accusing me of fabricating a case [] because I'm reporting to him what my investigator had told me eye witnesses have said"; regarding the one-eyed witness, "this is the one who knows [defendant] as well as the victim" and because defendant had admitted that he fired the gun, identity was not an issue; she had "no idea" to what defendant was referring when he talked about "changing courts" "other than" that his preliminary hearing was held in one department, and after he was held to answer, his case was assigned to a different department; she had gone over "the reports" with defendant "numerous times"; and she had explained to defendant that the police report and the preliminary hearing report would not be considered by the jury unless they were used for impeachment, and the jury's decision would be based on "live testimony" and defendant's testimony if he chose to testify with it being up to the jury as to what witness to believe.

The trial court explained to defendant that the change in courtrooms was the way "the system" worked and had nothing to do with Ms. Bosley. It denied defendant's *Marsden* motion, finding that "counsel has properly represented the defendant."

11

### 4.     *Analysis*

Defendant failed to show that the trial court's denial of his *Marsden* motions was an abuse of discretion.  Defendant did not make a """"substantial showing"""" that the trial court's denial of his *Marsden* motions were likely to result in constitutionally inadequate representation.  (*People v. Streeter*, *supra*, 54 Cal.4th at p. 230.)

Defendant contends that the attorney-client relationship between him and Ms. Bosley "erod[ed] and there existed an irreconcilable conflict" between them because Ms. Bosley filed declarations resulting in competency hearings; on one occasion the Sheriff's Department told Ms. Bosley that defendant refused to speak with her to prepare the case; defendant had told Ms. Bosley that he wanted to represent himself; and defendant was unable to communicate sufficiently with Ms. Bosley.  There is no indication in the record that Ms. Bosley or defendant's relationship with her was the reason the Sheriff's Department told Ms. Bosley that defendant refused to speak with her or that defendant was unable to speak to Ms. Bosley sufficiently.  Defendant's complaints do not constitute a substantial showing that they would likely result in constitutionally inadequate representation.  Lack of trust in or inability to get along with counsel is not a sufficient basis to grant a motion pursuant to *People v. Marsden*, *supra*, 2 Cal.3d 118.  (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070, overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

Defendant contends that because Ms. Bosley "had difficulty explaining" to him that selecting jurors for his competency proceedings was her decision and that she was not creating a case against him when she advised him what the witnesses told her investigator, an irreconcilable conflict exited between him and Ms. Bosley such that ineffective representation was likely to result.  Despite defendant's contention, neither defendant nor Ms. Bosley stated during the *Marsden* hearings that Ms. Bosley attempted to explain these matters to defendant, successfully or otherwise.  In addition, an attorney's difficulty in explaining an issue to the client does not, without more, constitute an irreconcilable conflict, nor does it mean that ineffective representation is likely to result.

12

Defendant argues that the trial court erred in denying his *Marsden* motions because Ms. Bosley did not subpoena the vision and hearing records of the percipient witness, Jose Elias. There were two *Marsden* hearings at which defendant said that he asked Ms. Bosley to scrutinize an adverse witness—the first *Marsden* hearing held on December 12, 2012, concerning the "alleged victim," Juan Jose, and the last *Marsden* hearing held on April 22, 2014 presumably concerning Jose Elias. That is, there was only one *Marsden* hearing at which he said that he asked his counsel to scrutinize Jose Elias.

Defendant contends that Ms. Bosley's failure to subpoena the vision and hearing records of Jose Elias is more than a tactical decision. Defendant reasons that because he was relying upon a defense of self-defense, and because defendant's version of the facts prior immediately prior to the shooting differed from Juan Jose's version of facts, Jose Elias' ability to perceive the events were relevant. According to defendant, Ms. Bosley therefore should have, at defendant's insistence, obtained Jose Elias' vision and hearing records. Defendant argues that Ms. Bosley's representation to the trial court that the vision and hearing records were not relevant because defendant's identity as the shooter was not at issue reflected "a disregard for consideration of [defendant's] concerns" and "a breakdown in communication." This, defendant argues, "was clearly an irreconcilable conflict that ineffective representation was likely to result." Defendant's contention that his counsel, Ms. Bosley, should have subpoenaed the vision and hearing records of Jose Elias is a disagreement over tactical decisions and that does not constitute error by the trial court in denying the *Marsden* motions. (*People v. Dickey*, *supra*, 35 Cal.4th at p. 922.)

In addition, defendant did not state that he asked Ms. Bosley to obtain Jose Elias's vision and hearing records. He merely told the trial court that he asked Ms. Bosley to "look[] at" him. Moreover, there is no evidence that Ms. Bosley disregarded defendant's concerns that Jose Elias's vision and hearing records would or may disclose that Jose Elias was unable to accurately perceive the events that transpired during the shooting incident. At most, it appears to have been a misunderstanding regarding defendant's concerns, and such a misunderstanding does not amount to an "irreconcilable conflict."

13

Defendant also did not establish that had Ms. Bosley obtained the vision and hearing records of Jose Elias that they would have established that he was unable to accurately perceive the incident events, beyond his purportedly having only one eye.

The trial court may accept defendant's counsel's explanation of the events at the *Marsden* hearings if there is a credibility question between a defendant and his counsel. (*People v. Jones* (2003) 29 Cal.4th 1229, 1245.) The trial court essentially found that Ms. Bosley's description of the relationship between her and defendant was more accurate than defendant's description. As our Supreme Court explained, "If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law. [Citations.]" (*Id* at. p. 1246; *People v. Welch*, *supra*, 20 Cal.4th at p. 728 ["A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense"].) The trial court did not abuse its discretion in denying defendant's *Marsden* motions.

### B.     CALCRIM No. 3472

Defendant claims that the trial court erred in instructing the jury with CALCRIM No. 3472 because the instruction had no application to the facts and it misstated the law. We disagree.

#### 1.     *Applicable Law*

"A trial court must instruct the jury . . . on all general principles of law . . . '"that are necessary for the jury's understanding of the case." [Citation.]'" (*People v. Burney* (2009) 47 Cal.4th 203, 246.) We assume that the jurors are intelligent persons and capable of understanding the jury instructions. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) ""'Instructions should be interpreted, if possible, so as to support

the judgment rather than defeat it if they are reasonably susceptible to such interpretation." [Citation.]' [Citation.]" (*Ibid.*)

"A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 39; *People v. Ramirez* (2015) 233 Cal.App.4th 940, 948-949.) The trial court's duty is "to ensure that the instructions provide a complete and accurate statement of the law." (*People v. Ramirez, supra,* 233 Cal.App.4th at p. 949.)

### 2. *Background Facts*

During discussions regarding jury instructions, the prosecutor requested that the jury be instructed with CALCRIM No. 3472.[7] The prosecutor stated, "I believe it is supported, because the victim testified to the defendant coming up to him, and in my view or at least there is evidence from which the jury could find that he provoked whatever response, if any, that the victim had. So the jury needs to know that if they find those facts to be true, that self-defense would not apply. For example, if they were to accept as true the defendant's initial statements to the police as stipulated to or stipulated that it was told, potentially this instruction would apply. Because they might believe that the victim put his hands on the defendant first. But they might also believe that that only happened after the defendant confronted him. Because that is essentially what it says in his statements. And I think under those facts, this instruction would apply. [¶] . . . [¶] [Juan Jose] didn't say he did anything. There would be no self-defense at all under [Juan Jose's] testimony alone. However, I do think . . . the following scenario is something the jury could believe happened, which based on putting the various statements and the victim's statements together, which is that the defendant armed with a handgun went to confront the victim, started basically talking trash to him, again armed

---

[7]    CALCRIM No. 3472 provides that "[a] person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

15

with a handgun. Then based on what he said, the victim shoves him and then the defendant shoots him. And I think under that state of facts, which I think is supported by the evidence as one potential version of what happened here, under that state of facts, this instruction would apply, arguably." The prosecutor stated that the victim testified that defendant "confronted" him and "started talking trash." Defendant also told the police that he was "looking to confront" the victim.

Defendant's counsel objected and said that the jury instruction was designed for a situation when an individual purposefully provokes a response from a victim to attack the individual, and the evidence does not reflect that this occurred. Defendant's counsel argued that none of the evidence established that defendant contrived a situation to claim self defense.

The trial court found that CALCRIM 3472 was supported by "both the statement that the defendant gave to the officer, as well as in conjunction with the testimony of the victim. The trial court instructed the jury pursuant to CALCRIM No. 3472.

### 3. Analysis

#### a) Substantial Evidence

Defendant contends that there was not substantial evidence to support CALCRIM No. 3472 because there no evidence that defendant provoked a use of force by Juan Jose. Substantial evidence supports instructing the jury with CALCRIM No. 3472.

CALCRIM No. 3472, uses the word "provokes" without qualification. The word "provokes" in a jury instruction has its usual, common meaning. (*People v. Cole* (2004) 33 Cal.4th 1158, 1217-1218.) Provocation has been defined to mean "something that provokes, arouses, or stimulates" (Merriam-Webster's Collegiate Dict. (11th ed. 2004) p. 1002); provoke means "to arouse to a feeling or action[;] . . . to incite to anger" (*ibid*.).

Words, without violence or a threat of violence, may be sufficient provocation to reduce murder to manslaughter. (See *People v. Valentine* (1946) 28 Cal.2d 121, 140-143 [words alone sufficient]; *People v. Manriquez* (2005) 37 Cal.4th 547, 583-584

16

["provocative conduct . . . may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection"].)

The parties stipulated a police officer would testify defendant told him he heard Juan Jose and Jose Elias were "going to meet up." Defendant said he considered it an opportunity "to confront" Juan Jose about "talking bad about him" and "spreading rumors." Defendant also told the police officer defendant attempted "to confront" Juan Jose.

Juan Jose testified that immediately before defendant shot him, defendant approached him, called him a "son of a bitch," accused him of "saying crazy things about" defendant, and "came up" to where Juan Jose was standing so close as to require Juan Jose to place his hands on defendant's chest "to create distance, because [defendant was angry" and Juan Jose did not want defendant "to [lunge] at" him. The jury reasonably could conclude that defendant provoked a use of force by Juan Jose.

b) Legally Erroneous

Defendant contends that under the facts of this case CALCRIM No. 3472 does not accurately state the law. Defendant relies on *People v. Ramirez, supra,* 233 Cal.App.4th 940, which held that although "CALCRIM No. 3472 states a correct rule of law in appropriate circumstances," (*People v. Ramirez, supra,* 233 Cal.App.4th at p. 947) "under the facts before the jury" in that case it "did not accurately state governing law." (*Ibid.*) In that case, "the instructions [which instructions included both CALCRIM No. 3472 and CALCRIM No. 3471] and the prosecutor's argument erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense." (*People v. Ramirez, supra,* 233 Cal.App.4th at p. 953). The court stated, "A person who contrives to start a fistfight or provoke a nondeadly quarrel does not thereby 'forfeit[] . . . his right to live.' [Citation.] Instead, he may defend himself 'even when the defendant set in motion the chain of events that led the victim to attack the defendant.' [Citation.]" (*Id.* at p. 943.) In other words, the fact

17

that defendant intends to provoke a fistfight does not mean the other person is entitled to use deadly force or a deadly weapon in response to the provocation. Defendant reasons that in this case CALCRIM No. 3472 does not accurately state the law because the jury could believe based on the evidence that defendant at most intended to provoke a fistfight and the instruction erroneously directed the jury to conclude that defendant had no right of self-defense against an attack by Juan Jose even if defendant's provocation was contrived to only use non-deadly force.

We need not decide whether CALCRIM No. 3472 accurately states the law under the facts of this case as any error in the instruction was harmless. "'"'[M]isdirection of the jury, including incorrect . . . instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in [*People* v.] *Watson* [(1956) 46 Cal.2d 818]'" under which "'a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

Defendant told a police officer on the day of the shooting that he attempted to confront Juan Jose. He also told the officer that Juan Jose "pushed" him and he then "lost control of his thoughts" and shot Juan Jose. Although defendant testified that Juan Jose put his hands around defendant's neck prior to the shooting, he admitted that he did not advise the officer on the day of the shooting that Juan Jose choked him. It is not reasonably probable that the jury would have credited defendant's self-serving testimony that he shot Juan Jose in self-defense, even had the jury not been instructed with CALCRIM No. 3472. Similarly, any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

### C.     Correction Regarding Defendant's Presentence Custody Credits

Defendant contends, and the Attorney General agrees, that the judgment must be modified, and the abstract of judgment must be amended, to reflect that defendant is entitled to receive 1259 in total presentence credits instead of 1244 in presentence credits. We agree.

18

The trial court awarded defendant a total of 1,244 days of custody credit consisting of 1082 days of actual custody credit and 162 days of conduct credit. Defendant however was in custody for 1,095 days. Because pursuant to section 2933.1 defendant is subject to a 15 percent conduct credit limitation, defendant should have received 164 days of conduct credit. Thus, the judgment should be modified, and the abstract of judgment must be amended, to reflect that defendant is entitled to receive a total of 1,259 days of custody credit consisting of 1,095 days of actual custody credit and 164 days of conduct credit.

**D.      Amending the Abstract of Judgment to Reflect That Defendant Was Convicted by a Jury**

Defendant contends, and the Attorney General agrees, that the abstract of judgment must be amended to reflect that defendant was convicted by a jury instead of by plea. We agree. The abstract of judgment must be amended accordingly.

## DISPOSITION

The matter is remanded for the trial court to modify the judgment and amend the abstract of judgment to reflect that defendant is entitled to receive a total of 1,259 days of custody credit consisting of 1,095 days of actual custody credit and 164 days of conduct credit, and to amend the abstract of judgment to reflect that defendant was convicted by a jury. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, Acting P. J.


We concur:


KRIEGLER, J.


BAKER, J.

20