Filed 5/16/16  P. v. White CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PHILLIP WHITE,<br><br>        Defendant and Appellant. | A139043<br><br>(Alameda County<br>Super. Ct. No. C159183) |

Phillip White appeals from a judgment upon a jury verdict finding him guilty of first degree murder (Pen. Code[1], § 187, subd. (a)).  The jury also found true the allegation that defendant used a deadly weapon in the commission of the offense (§ 12022, subd. (b)(1)).  Defendant contends that:  (1) there is insufficient evidence of premeditation and deliberation to support a first degree murder verdict; (2) the prosecutor committed misconduct in his closing argument; (3) the trial court abused its discretion in refusing to suspend proceedings pursuant to section 1368; and (4) the court violated his constitutional and statutory right to be present during a critical stage of the proceedings. We affirm.

## I.  FACTS

Jacqueline Mason lived with her two daughters and two grandsons in a three bedroom apartment in Oakland.  Mason's bedroom was adjacent to her daughter,

---

[1] All further statutory references are to the Penal Code.

Jacqueline's,[2] bedroom. Revlon Majeste, Mason's older daughter, stayed in the bedroom directly across from Mason's. Majeste's two sons slept in the living room. Defendant, who was romantically involved with Mason, was staying with her during the last week or two of June 2007, and shared her bedroom. Mason was 43 years old; defendant was 27. Jacqueline characterized her mother's relationship with defendant as a "love/hate type relationship." Majeste testified that both defendant and Mason told her about arguments they were having, and that their relationship had become tense.

On the evening of June 28, 2007, Mason, defendant, and Majeste had plans to go to a club where Mason and defendant were going to perform some songs at an open mike venue. Before they left for the club, defendant and Mason were avoiding each other and there was tension in the apartment. Defendant told Majeste he was not getting along with Mason because she was not giving him enough respect. He complained that Mason treated him like a child. He said, "She's pushing me to no limit with talking to me crazy, and I could just snap." Majeste and defendant had a similar conversation a day or two previously.

Defendant and Mason left for the club at approximately 10:00 p.m. Majeste went to the club about an hour later. Defendant mingled at the club while Mason stood around waiting for her turn to perform on stage. At midnight, Mason decided to leave because she was not getting an opportunity to perform and was frustrated. She asked Majeste to give defendant a ride to the apartment.

Mason returned home at about 1:15 a.m. Jacqueline testified that she appeared irritated and told her that defendant was getting on her nerves. Mason went to her bedroom and packed defendant's things in his two duffle bags. Mason said, "I'm sick of him. He got to get out of my house." Jacqueline went to her bedroom and went to sleep.

Meanwhile, defendant performed a rap song at the club and left the club with Majeste around 1:00 or 2:00 a.m. Defendant was not intoxicated, and seemed energetic and ready to continue the evening. Defendant and Majeste decided to check out a bar in

_____

[2] For ease of reference, we use Jacqueline's first name in this opinion.

North Oakland but when they arrived, it was closed. They returned to the apartment and Majeste went inside. Defendant remained outside with a neighbor. Majeste prepared to go to bed. She did not check on her mother, but did notice defendant's duffel bag in the kitchen. As she was falling asleep, she heard her mother say, "Get the fuck out of my room." She heard Mason and defendant arguing and then fell asleep.

Majeste woke up between 9:00 and 10:00 a.m. She looked in on her mother and saw the back side of a naked body on her mother's bed and assumed it was defendant. She immediately closed the door because she did not want to violate his privacy. She assumed that her mother had left the apartment early. Majeste left the apartment to take her children to daycare and noticed that her mother's van was gone.

Jacqueline woke up about 10:00 a.m. and realized that her mother was not breathing. She called Majeste, who drove back to the apartment. On the way, Majeste flagged down a police car that followed her home.

The police found Mason lying half off the bed. There was a cut and blood on her head and cuts on her arms and hands. She was not breathing. Additional police officers, medical personnel, and Jeffery Haymon, a crime scene technician, responded to the scene. Haymon found Mason lying face down on the bed. She had injuries to her face, neck area, and arms. Haymon found blood on Mason's body and bed; he did not find blood anywhere else. Mason's purse was lying near the foot of the bed. Some of its contents were strewn nearby it. Mason's keys and wallet were missing. One of the drawers of the nightstand next to the bed was open. Haymon searched the apartment for a knife that could have caused Mason's injuries, but did not find one.

Dr. Thomas Rogers, a forensic pathologist, performed an autopsy on Mason. Mason had a total of 12 wounds on her body including stab wounds and incised wounds. A stab wound tends to go deeper into the body, while an incised wound is more superficial. Rogers numbered the wounds. Wound number 1 was a stab wound located on the right side of the face, in front of the right ear. It was 2 and 5/16 of an inch in length. It penetrated into the neck, involved major blood vessels, and would have caused most people to die within a three-to-five minute period without medical intervention.

Wound number 2 was behind the right ear; number 3 was to the area of the right collarbone; number 4 was to the left side of the back; and number 5 was to the outside of the right upper arm. Wounds numbers 3 to 5 were superficial wounds. Wounds numbers 1 through 5 were consistent with the possibility that Mason was lying face down on the mattress when she was stabbed. Wound number 6 was to the right forearm and extended about half an inch beneath the surface of the skin. Wound numbers 7 and 8 were stab wounds to the right wrist. Wound number 9 was an incised wound to the top part of the right hand. Wounds 10 and 11 were superficial wounds to the right fourth and fifth fingers, respectively. Wound number 12 was also a superficial wound to the back side of the right hand. Wounds numbers 6 to 12 were consistent with defensive wounds. Dr. Rogers opined that the cause of death was multiple stab and incised wounds.

Defendant was arrested in Denver, Colorado on July 1, 2007. Detective Tony Jones interviewed defendant in Denver. Defendant waived his *Miranda*[3] rights. He was alert and coherent during the interview. He said that he and Mason had argued around 5:00 p.m. on June 28, 2007, but they agreed to go to the club that evening to perform. When he returned from the club, he was surprised to find that she had packed his bags. When he tried to lay down on her bed, she shoved him out of the bed and told him he needed to leave "by tomorrow." She said, "It's nothing to have you touched.[4] If you ain't gonna leave my house . . . ." He left the room and went to surf the internet, but Mason came out and took the mouse for the computer. She told him not to use her stuff. He tried to talk with her again in the bedroom but she told him to sleep on the floor. He then went to the kitchen to make himself a sandwich, but again Mason came out and took the big knife he was using back to her bedroom because she did not want him to use her things.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

[4] Jones testified that the term "touched" was common street terminology for a threat.

Defendant went into the bedroom a third time to try to talk to Mason, but she did not want to talk. Defendant went into the living room, but could not find a place to sleep because Majeste's children were sleeping on the couch. So he went back to Mason's room and it was "chaos." The next thing he remembered was that he was at a toll booth crossing the bridge into San Francisco. He acknowledged that he took Mason's van and one of his bags. He parked the van and then took a cab to the Greyhound station, where he boarded a bus to Reno. He said that he needed help to know what happened in Mason's apartment, as he did not think he was capable of doing "it." He complained that Mason treated him like he was one of her kids, but said he stayed with her because she had connections and he needed help with his music career. He could not remember how he got Mason's credit card or the keys for the van.

Dr. Bruce Smith, a clinical and forensic psychologist, testified on defendant's behalf. Dr. Smith opined that defendant suffered from chronic post-traumatic stress disorder (PTSD) and a schizoaffective disorder. It is likely that he had the schizoaffective disorder at the time of the murder. Dr. Smith also opined that someone with defendant's conditions was likely to act impulsively and without thought or consideration when threatened.

Dr. Smith also testified that every professional who had evaluated defendant observed that he is either exaggerating or malingering some symptoms, and that he might have claimed some symptoms that he knew he did not have. He concluded that "[t]he severity of [defendant's] current psychiatric impairment cannot be determined with any degree of certainty because of his tendency to exaggerate."

Defendant testified in his own defense. He met Mason at a club in Atlanta, Georgia in 2001 or 2002. They began a romantic relationship and he moved into her home. They moved to Akron, Georgia and he lived with her until 2003. They got along sometimes, but also argued—Mason was jealous and accused him of being with other women. On one or two occasions, she broke things and tried to prevent him from leaving the house. On one occasion, she brandished a weapon at him.

5

On June 29, 2007, defendant returned to Mason's apartment after performing at the club and found that his bags had been packed. He entered Mason's bedroom a couple of times—first to find out why she had packed his things and the second time to find a place to sleep. They argued and defendant left the room only to return a third time. Mason was awake and was at the doorway of the room when he entered. She tried to prevent him from getting into the bed. Defendant tried to move her out of the way. When Mason moved toward her dresser, defendant saw the knife that she had taken from the kitchen. He reached the knife before Mason and stabbed her with it. They fell to the bed, with defendant on top of her and stabbing her. She was face down at some point. He didn't remember much about the stabbing. He, however, knew she was dead when he left the apartment.

Roy Kates, defendant's uncle, testified that he saw defendant with Mason in Marietta, Georgia in 2003. Kates saw Mason pull a knife on defendant, saying that she was tired of him using her car and "messing" with girls. She slapped him with her hand.

Tramayne Baker, who was in custody for a parole violation, testified that he was involved in a romantic relationship with Mason from 2003 to 2005. They had a few "fallouts" over her jealousy that he might be interested in younger women. Mason hit him once, broke his Playstation, and threw a remote control at him. She threatened to kill Baker if he cheated on her, but he did not take her threat literally. They laughed about it later. He did not feel threatened by her.

In rebuttal, Deputy Sheriff Fernando Rojas testified that on March 17, 2009, defendant threw urine on another inmate and fought with him. The inmate sustained a small scratch to his forehead.

On January 3, 2011, defendant attacked another inmate. And, in March 2012, defendant was involved in another fight at the jail in which he punched an inmate.

## II. DISCUSSION

### A. *Sufficiency of the Evidence of Murder*

Defendant contends that the evidence is insufficient to support the jury's verdict of first degree murder because the evidence of premeditation and deliberation was lacking.

To constitute murder in the first degree, the jury was required to find that the defendant "acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (CALCRIM. No. 521.) The jury may consider any relationship between the defendant and the victim; the defendant's behavior before the killing, including the existence or non-existence of planning; the manner of the killing; and any motive for the killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*).)

We review the judgment under the substantial evidence standard. (*People v. Hatch* (2000) 22 Cal.4th 260, 272.) Under this standard, we must review " 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*Ibid.,* quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578.) If the circumstances reasonably justify the verdict, we cannot reverse merely because a contrary finding might also be reasonably deduced from the circumstances. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) We will reverse only if it "clearly appear[s] that upon no hypothesis whatever is there sufficient substantial evidence to support [the judgment]." (*Ibid.*)

Relying on *Anderson*, *supra*, 70 Cal.2d 15, defendant argues that the evidence fails to show any planning activity, premeditation, or deliberation. The *Anderson* court identified three categories of evidence which are sufficient to support a finding of

premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing. (*Id.* at pp. 26–27.) "Analysis of the cases will show that [the Supreme Court] sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) and (3)." (*Id.* at p. 27.) In *Anderson*, the court held that there was insufficient evidence of premeditation or deliberation because the evidence of planning activity was ambiguous, there was insufficient evidence from which to infer a motive, and the brutal slaying of the victim—60 wounds over the entire body—did not support an inference of deliberately placed blows but rather showed haste and impetuousness. (*Id*. at p. 21–22, 31.)

In *People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*), our Supreme Court cautioned that "[t]he *Anderson* factors, while helpful for purposes of review, are not the sine qua non to finding first degree premeditated murder, nor are they exclusive." There, the Court held that there was sufficient evidence of premeditation and deliberation though it appeared that the defendant did not form the intent to kill until he was confronted by the victim. (*Id.* at p. 1126.) The evidence showed that the defendant, who was known to the victim, entered her house surreptitiously and surprised her. He beat her in the head and neck and then stabbed her with a steak knife. When that knife broke, he retrieved another knife from the kitchen and stabbed her to death. (*Ibid.*) Though the evidence was not overwhelming on the issues of premeditation and deliberation, the court determined that the evidence showed that the defendant "once confronted by [the victim], who knew him and could identify him, he decided to kill her to avoid identification." (*Id.* at pp. 1126–1127.)

In *People v. Wharton* (1991) 53 Cal.3d 522, 547 (*Wharton*), the court recognized that premeditation can occur in a relatively short time. The court held that there was sufficient evidence of planning activity based on the defendant's retrieval of the murder weapon right before the murder. There, the evidence showed that defendant murdered the woman with whom he was living and claimed that he hit her in the head three times

8

with a hammer in a rage. He took many of the victim's valuables and used the items to buy drugs and alcohol. (*Id.* at p. 543.)

Here, as in *Perez* and *Wharton*, the evidence was sufficient to demonstrate premeditation and deliberation. Defendant and Mason had argued earlier in the evening. When he returned to the apartment, he found that Mason had packed his bags. He confronted her and she told him to get out of her house. At some point thereafter, he retrieved a knife and stabbed her in the back as she was lying on her stomach. Mason apparently attempted to defend herself given the defensive wounds on her right arm and hand, but was overpowered by defendant. The fact that Mason was not able to cry out and wake up the others in the apartment suggests that defendant acted quickly in stabbing her in the right side of her neck. (See *People v. Pride* (1992) 3 Cal.4th 195, 247–248 [placement of wounds supports inference that death was calculated and not the result of an unconsidered or rash impulse].) As the Attorney General argues, "[t]he degree of physical control over Ms. Mason that appellant had before he even started to stab her was substantial evidence that he had deliberated."

There was also evidence of motive. Defendant's anger at Mason for treating him like a child no doubt escalated when he discovered that she had packed his things upon his return to the apartment. The jury could have inferred that the killing was premeditated and deliberate and that defendant formed the intent to kill her when she told him to get out of her room. As the *Perez* court explained, " '[t]he true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" (*Perez, supra,* 2 Cal.4th at p. 1127.) While defendant testified that it was Mason who brought the knife into the bedroom, it was equally plausible that defendant, upon being told to get out of Mason's room, retrieved the knife from the kitchen in order to kill Mason. Even if the jury believed his testimony that Mason had taken the knife into the bedroom, defendant admitted that he was able to get to the knife before Mason and that he used it to stab her. Finally, that Mason was killed rapidly within three to four minutes and had no opportunity to cry out suggests that defendant did not kill her in a

9

rash manner but that he killed her in a deliberate plan to subdue her quickly.  (*People v. Solomon* (2010) 49 Cal.4th 792, 813 ["a killing resulting from preexisting reflection, of any duration, is readily distinguishable from a killing based on unconsidered or rash impulse"].)  That there was no blood found anywhere but on the bed also showed that there was no real struggle.  Further, the jury was entitled to reject defendant's self-serving statements that he did not remember the killing given his inconsistent statements to the police.  (*Wharton*, *supra*, 53 Cal.3d at p. 547 [jury entitled to reject the defendant's testimony where his version of the killing was inconsistent and he was less than forthcoming during his interview with the police].)  In sum, there was substantial evidence of premeditation and deliberation to support the verdict.

### B.  *Prosecutorial misconduct*

Defendant contends that the prosecutor committed misconduct by improperly evoking the jury's sympathy during closing argument, mischaracterizing the evidence and by relying on facts that were not in evidence.  He also argues that his defense counsel was incompetent for failing to object to the prosecutor's improper statements.

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury by admonished to disregard the impropriety.' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*), quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)  Here, defendant did not object to some of the prosecutor's comments that he alleges constitute misconduct; we, however, review each of these comments in light of the fact that defendant claims his trial counsel was ineffective for failing to object to them.

Defendant first contends that the prosecutor committed misconduct by evoking the sympathy of the jury by his comments that Mason was no longer here to spend time with her family.  The prosecutor commenced his argument with the following comments: "You know Jacqueline Mason should still be doing a lot of things.  She should still be waking up every morning and still be getting ready for class, getting ready to go to work. She should still be waking up every morning and seeing her daughters Revlon and little

10

Jackie, and also be spending time with her grandkids, Justin and Jason." Defense counsel objected to the argument and counsel discussed the issue in a sidebar conference. The prosecutor, however, then continued: "She should be doing all those things. Most of all she should still be alive and well. But she's not. She's not because somebody decided on his very own to end her life. Somebody decided on his very own when she would die, how she would die, and where she would die. [¶] Somebody made this decision without considering how it would affect Revlon, how it would affect Jackie, and everybody else that Ms. Mason knew. That person who made that very selfless [sic] decision is the defendant."

The court later memorialized the sidebar discussion: "The nature of Mr. McDougall's [defense counsel] objection was that Mr. Lau's [deputy district attorney] comments in regard to Ms. Mason were prejudicial; and so I overruled that objection in chambers and indicated to Mr. Lau that he should move on from that subject. That was fine, but too much of that indeed was prejudicial.[5] That was the Court's ruling. [¶] Mr. Lau had a few other comments before he moved into the heart of his argument, and so I didn't see anything that was particularly prejudicial or objectionable."

" '[A]n appeal for sympathy for the victim is out of place during an objective determination of guilt.' [Citations.]" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1129–1130 (*Kipp*) [misconduct to argue, in discussing the killing of a human being, that "[i]f you would, think for a moment about what it means. A living, breathing human being had all of that taken away"].) We agree with defendant that the prosecutor's remarks here were an appeal to the jury for sympathy for the victim and were therefore improper. Prosecutorial misconduct, however, requires reversal only when, viewing the record as a whole, it results in a miscarriage of justice. (*People v. Green* (1980) 27 Cal.3d 1, 29, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239.)

---

[5] The court apparently misspoke in its remark that the comments were prejudicial. The court's further remarks reflect that it found the prosecutor's argument was "not particularly prejudicial."

11

As in *Kipp, supra,* 26 Cal.4th at p. 1130, the remarks, reflecting on what Mason had lost, were not prejudicial. They were not lengthy and were not repeated. They could not have swayed the jury. Moreover, the jury was instructed that it was not to "let bias, sympathy, prejudice or public opinion influence your decision." We must presume that the jury followed the court's instructions. (See *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

Defendant also argues that the prosecutor committed misconduct by his remarks that the wounds inflicted on Mason were focused, exact, and precise. Defendant did not object to the argument. For example, the prosecutor argued, "when he made [the decision to use the knife], the blows were so exact, they were so precise to vital areas of her face and her neck, there's no question what he was thinking." He asserts that these remarks distorted the physical evidence and Dr. Roger's testimony about the knife wounds. We disagree.

A prosecutor is given wide latitude during closing argument. " ' " 'The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Hill, supra,* 17 Cal.4th at p. 819.) Here, the prosecutor's argument was based on the evidence which showed that with one exception, all of the wounds were to Mason's right side, including the fatal wound and two others to her neck area. Seven of the other wounds were to Mason's right arm and hand and were characterized by Dr. Rogers as defensive wounds. In light of this evidence, it was reasonable for the prosecutor to argue that defendant aimed his knife in a focused manner to Mason's neck area. The prosecutor's argument was a fair comment on the evidence. (See *People v. Martinez* (2010) 47 Cal.4th 911, 957 [prosecutor's description of victim suffering a savage injury reflecting on defendant's violent capabilities was fair comment on the evidence].)

Defendant also asserts that the prosecutor misrepresented the testimony of Dr. Smith, the forensic and clinical psychologist. He claims that the prosecutor improperly argued that Dr. Smith admitted that the diagnosis of PTSD is not scientific because there is no test for it like an x-ray.

12

On cross-examination, the prosecutor asked Dr. Smith if there were any scientific tests to validate PTSD. In explaining that PTSD cannot be diagnosed with a test like an x-ray, Dr. Smith explained that PTSD is based on a subjective assessment of the symptoms and history of a patient. He testified that the diagnosis is an opinion based on an analysis of the data that is available. In closing argument, the prosecutor paraphrased the exchange with Dr. Smith as follows: " 'Hey, Dr. Smith, is there some scientific test to PTSD like an x-ray, you could check somebody's broken arm?' 'No, there isn't. But there are tests, but it's not scientific.' 'Oh really, Dr. Smith. So it's subjective?' 'Yes, it is.' 'It's open to interpretation?' 'Yes, it is.' "

Defendant argues that the prosecutor mischaracterized Dr. Smith's testimony because Dr. Smith never admitted that a diagnosis of PTSD is not scientific. The prosecutor, however, was simply arguing that there was no objective test for PTSD and that it was a subjective diagnosis based on the doctor's interpretation of the available data. His argument was based on reasonable inferences from the evidence; it did not constitute misconduct. (See *Hill, supra,* 17 Cal.4th at p. 819.) Even if the prosecutor misstated Dr. Smith's testimony in any regard, the error was harmless in view of the overwhelming evidence of defendant's guilt.

Defendant further asserts that the prosecutor committed misconduct when he confronted Dr. Smith with the finding of another psychologist, Dr. Marlon Griffith, that defendant was intentionally evasive and did not have a cognitive impairment. He claims that the statement was false because Dr. Smith testified that all of the psychologists and psychiatrists who examined defendant concluded that he had a major mental illness and suffered from cognitive impairment. Again, the statement was a fair comment on the evidence. As the Attorney General points out, Dr. Smith did acknowledge that not every mental health professional had diagnosed defendant with a mental illness and that there were findings that he exaggerated or malingered some symptoms. And, Dr. Smith admitted that Dr. Griffith suggested that defendant was intentionally evasive rather than

13

cognitively impaired.[6]  On this record, the prosecutor's argument did not constitute misconduct.

Finally, defendant contends that the prosecutor committed misconduct by basing his argument on facts that were not in evidence.  He faults the prosecutor for arguing that there was a finding that defendant was intentionally evasive rather than cognitively impaired and claims that Dr. Smith was never confronted with that statement.  But the record shows that Dr. Smith was indeed asked about Dr. Griffith's report that defendant's conduct during testing suggested intentional evasiveness rather than cognitive impairment.

" ' "In cross-examining a psychiatric expert witness, the prosecutor's good faith questions are proper even when they are, of necessity, based on facts not in evidence. [Citation.]" ' " (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1325.)  Here, the prosecutor's questioning of Dr. Smith was based on Dr. Griffith's report, which was not before the jury, but was considered in defendant's competency proceedings before trial.  Dr. Smith had also reviewed the report in preparing his evaluation of defendant.  The prosecutor's question regarding Dr. Griffith's report was therefore not improper.  Contrary to defendant's argument, the prosecutor did not misrepresent Dr. Griffith's report to the jury.  The prosecutor's closing argument referencing Dr. Smith's testimony regarding Dr. Griffith's findings was not objectionable.

### C.  Mental competency

In November 2009, following the filing of the information in this case, defendant was found incompetent to stand trial.  On January 14, 2011, the trial court found that defendant was competent and reinstated criminal proceedings.  Jury selection commenced on March 12, 2012.  The court met with the prospective jurors, who were given questionnaires and asked to return for further voir dire on March 14, 2012.  On

---

[6] The following exchange occurred during the cross-examination of Dr. Smith: "[MR. LAU]:  According to Dr. Griffith, these examples [defendant discontinuing mental health testing] suggested intentional evasiveness rather than cognitive impairment, correct?  [¶] [DR. SMITH]: Correct."

14

March 13, 2012, in light of the schedule, defendant's presence was excused for the day. Defense counsel, however, alerted the court that he wished to express some concerns about defendant's mental health. He waived defendant's appearance for the proceeding. He explained that after thinking about defendant's disruptive behavior the previous day—defendant had stormed out of the courtroom after being denied a telephone call to his mother—and other things, including defendant's complaints that he was not receiving the proper medication or treatment for his mental disease, he had a doubt about whether defendant was competent to stand trial. Counsel related that defendant had difficulty keeping on track and focused on low priority matters. He concluded, "I haven't until now acted on any reservations that I've had about Mr. White's competence to stand trial, but . . . I feel I can no longer continue to balance it in my mind or continue to assess Mr. White's behavior. [¶] I'm not trained as a psychologist, and I think that given his history, some of the things I've observed of him, which seems—which are identical to things observed and documented when he underwent competency proceedings a couple of years ago, that it's time for the Court to consider the issue and exercise its powers and responsibilities under [section] 1386 and related sections." The prosecutor responded that he did not doubt defendant's competency and defendant had simply acted out because he was unhappy with the court's decision. The prosecutor noted that defendant was aware of the proceedings: "He testified at a *Miranda* hearing. He knew what the issues were at *Miranda* hearings. [¶] It sounds like he's been able to communicate with Mr. McDougall in talking about what the defense is going to be; and from the reports, there certainly are signs of exaggerations, malingering, doubts as to whether he is really truly facing a mental disorder or if he's just playing it up for trial leniency or any secondary beneficial preferences."

The court denied the request to suspend proceedings. The court noted that defendant had been in its courtroom for a week during which defendant had brought a *Marsden*[7] motion and a long hearing had ensued. The court remarked that it was "clear"

---

[7] *People v. Marsden* (1970) 2 Cal.3d 118.

15

to it "through those discussions that Mr. White is very well aware of what these proceedings are about. [¶] He expresses himself quite clearly in regard to his own desires and wishes and needs. When those conflict with his lawyer's intentions or the Court's, Mr. White gets very frustrated." The court further commented that defendant "testified quite lucidly during the *Miranda* hearing. He didn't like the fact that he didn't prevail at the *Miranda* hearing. He got very huffy at the table, and shuffling around and making noise with his documents and his stack of papers when that didn't go his way. [¶] And the reports indicate that while Mr. White does suffer from some sort of mental illness, there is a degree of exaggeration that has been present throughout . . . both initial evaluations . . . . [¶] But it's clear to me that when Mr. White wants something, his ability to communicate that to both counsel and the Court is quite clear and fervent . . . . [¶] . . . [¶] [I]t is, without question, not a situation in which Mr. White does not understand the nature of these proceedings, the gravity of these proceedings, where he is, and what this is about. No question about that. He knows what's going on. [¶] The question, a more nuanced one, is whether he has an ability to assist in his defense. And while I sympathize with Mr. McDougall's difficulty in getting Mr. White's cooperation on some points, because Mr. White seems fixated on a lot of other things at different times that are not necessarily pertinent to his defense, like a phone call to his mother or like some of his medical issues, but I don't think that there is substantial evidence that would raise in the mind of an objective observer a reasonable doubt that Mr. White has the present ability to assist in his own defense. [¶] His willingness is another thing, but these proceedings cannot be controlled by a defendant's willingness to assist in his own defense except to the extent that the Court were to find or be concerned that whether that willingness was—or lack of willingness—was really the product of some mental disorder or disease. And I don't see that to be the case. I think it's a personality issue with Mr. White. And he seems quite capable of conforming his behavior to situations that he's agreeable with; that is, when he wants to do something, he's 'Mr. Cooperative.' If he doesn't want to do it, we all have to hear about how it's not what he wants and frustrating and unfair to him . . . ."

16

Under section 1368, if "a doubt arises in the mind of the judge as to the mental competence of the defendant" at any point during the criminal proceedings, the court must declare a doubt as to the defendant's competence and suspend proceedings until a hearing can be conducted to determine if the defendant is mentally competent. (§ 1368, subd. (a); *People v. Stankewitz* (1982) 32 Cal.3d 80, 91–92.) " 'Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1415.) "A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial." (*People v. Rogers* (2006) 39 Cal.4th 826, 847.)

Here, a competency hearing had already been held prior to trial and the court found defendant competent to stand trial. While defense counsel alluded to defendant's difficulties in focusing on certain issues and his complaints about proper medication, he did not offer new evidence of defendant's incompetence or show changed circumstances. There was thus no need to conduct a second competency hearing. Moreover, the court, which had the opportunity to observe defendant in several pretrial hearings, found that he participated in the proceedings, was well aware of what was transpiring, and had the ability to assist in his defense. In particular, the court noted that defendant had brought a *Marsden* motion and expressed his concerns clearly, and that he testified lucidly during his *Miranda* hearing. There was thus no indication that the circumstances had changed since the first competency hearing. "[T]he trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state. This is particularly true when, as here, the defendant has actively participated in the trial." (*People v. Jones* (1991) 53 Cal.3d 1115, 1153.)[8] On

_____

[8] *People v. Sundberg* (1981) 124 Cal.App.3d 944, upon which defendant relies, is distinguishable. There, trial counsel informed the court that the psychiatrist who had previously found the defendant to be mentally competent had given a further opinion that

17

this record, the court did not err in denying defense counsel's request to hold another section 1368 hearing.

### D. *Voluntary absence from the proceedings*

Finally, defendant contends that the trial court violated his constitutional rights to be present at a critical stage of the proceedings when the court heard defense counsel's doubts as to his competency outside his presence.

" 'A criminal defendant's right to be personally present at trial is guaranteed by the Sixth and Fourteenth Amendments of the federal Constitution . . . . [Citations.]' " (*People v. Lucero* (2000) 23 Cal.4th 692, 716–717 (*Lucero*).) A defendant also has a state constitutional and statutory right to be present at critical proceedings. (*People v. Perry* (2006) 38 Cal.4th 302, 311 (*Perry*).) " 'A defendant, however, "does not have a right to be present at every hearing held in the course of a trial." [Citation.] A defendant's presence is required if it "bears a reasonable and substantial relation to his full opportunity to defend against the charges." [Citation.] The defendant must show that any violation of this right resulted in prejudice or violated the defendant's right to a fair and impartial trial.' " (*Lucero*, *supra*, 23 Cal.4th at p. 717.)

Here, defendant was not present in the courtroom because the parties had not anticipated having any proceedings in open court; counsel were present only for the purpose of picking up copies of the jurors' questionnaires. When defense counsel brought up the issue of defendant's competency, he waived defendant's presence. We need not address the validity of the waiver because any error in excluding defendant from the proceedings was harmless. (*Lucero*, *supra*, 23 Cal.4th at p. 716.)

We do not question that a competency hearing can be a critical stage of the proceedings. (See *Appel v. Horn* (3rd Cir. 2001) 250 F.3d 203, 215.) But the "hearing" at issue in this case was not a competency hearing; rather defense counsel simply wanted

the defendant was probably not mentally competent to stand trial. (*Id.* at p. 957.) Trial counsel requested a continuance to confirm the psychiatrist's opinion by another psychiatrist. (*Ibid.*) Here, by contrast, defense counsel did not have any new evidence that defendant was currently suffering from a mental disorder. To the contrary, he acknowledged that defendant might be exaggerating his symptoms.

to alert the court of his concerns about defendant's mental health and to request that the court suspend proceedings so the issue of his competence could be determined at a competency hearing. (See *Perry*, *supra*, 38 Cal.4th at p. 312 ["a defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case"].) Defendant's presence thus was not required; the proceeding was not critical, and he has failed to show that his presence would have made any difference in the outcome of the trial. The court, as we explained, *ante*, had the opportunity to observe defendant in court, and opined that there was no substantial change in defendant's mental health or evidence suggesting the need for a new competency hearing. Defendant never raised the issue of his competency once the trial commenced. He has failed to show he was prejudiced by his absence.

## III. DISPOSITION

The judgment is affirmed.


_____
Rivera, J.


We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.

19